**NOT FOR PUBLICATION**                                    **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

TERRENCE ECHOLS,                          :

                      Petitioner,          :

                                           :        Civil Action No. 09-5548 (JLL)

          v.                               :

                                           :        **O P I N I O N**

MICHELLE RICCI, et al.,                    :

                      Respondents.         :        RECEIVED

---                                                 AUG 1 8 2011

                                                    AT 8:30 _____ M
**LINARES**, District Judge:                        WILLIAM T. WALSH, CLERK

     Petitioner Terrence Echols ("Petitioner") filed a Petition ("Petition") seeking a writ of

habeas corpus, pursuant to 28 U.S.C. § 2254(a), challenging a judgment of conviction in the

Superior Court of New Jersey.  The Court has considered the submissions made in support of and

in opposition to the instant Petition.  For the reasons expressed below, the Court dismisses the

Petition and declines to issue a certificate of appealability.  See 28 U.S.C. §§ 2253(c), 2254(a),

(b), (c).

     The lengthy procedural posture of Petitioner's underlying state proceedings as well as the

testimonies submitted during Petitioner and his co-defendant's trial necessitate a detailed factual

analysis on the part of this Court.  Thus, the Court will consider: (a) the standard of review

applicable to Petitioner's challenges; (b) the relevant testimonies submitted during trial; ( c) the

determinations reached by the state courts; and (d) Petitioner's habeas claims.

TABLE OF CONTENTS

I.      Standard of Review

II.     Procedural Posture and Substantive Findings

    A.      Factual Background

        1.      Events Associated with Petitioner's Conviction

        2.      Petitioner's Trial

            a.      Prosecutor's Opening Statement

            b.      Testimonies of Witnesses Called by the State

                i.      Jones' Testimony

                ii.     Irvin's Testimony

                iii.    Dansby's Testimony

                iv.     Thomason's Testimony

            c.      Testimony of Smallwood

                i.      Outside-the-Jury Colloquy and Testimony

                ii.     Testimony Before the Jury

    B.      Trial Court's Additional Clarification to the Jury Charge

    C.      Determinations Made During Petitioner's PCR Proceedings

        1.      Law Division's Findings

        2.      Appellate Division's Findings

        3.      Decision Reached by the Supreme Court of New Jersey

III.    Exhaustion Requirement

IV.     Discussion

    A.      Petitioner's Instant Challenges

    B.      Umbrella Legal Principles

    C.      Analysis

        1.      Claims Related to Smallwood's Testimony

            a.      Claims Articulated with a Better Degree of Clarity

                i.      The "'Proper' Alibi Examination" Sub-Claim

                ii.     The "Notice of Alibi and Jury Instructions" Sub-Claims

                iii.    The "Theory of the Case and Summation" Sub-Claims

            b.      Barely Articulated Claims

                i.      The "Speculative Timetable" Sub-Claim

                ii.     The "Speculative Witnesses" Sub-Claim

2

                   iii.     The "Witnesses-in-Prison-Garb" Sub-Claims

    2.    Claims Related to Testimonies of Other Witnesses

        a.     The "Geography-and-Taxi-Cab" Claims

              i.     The "Lack-of-Window-View" Sub-Claims

              ii.    The "Direction of Flight" Sub-Claim

        b.     The "Lack-of-Sanitization" Claims

           b-1.    Petitioner's Incorrect Legal Principles

           b-2.    Controlling Legal Principles

           b-3.    The Trial Court's Rationale for Admission

           b-4.    Claims Based on Thomason's Testimony

                 i.     The "Time-Line-Inconsistency" Sub-Claim

                ii.    The "Lack-of-Fear-of-Arrest" Sub-Claim

               iii.    The "Landing-on-the-Baby" Sub-Claim

               iv.    The "Rambling-About-Rape" Sub-Claim

                v.    The "Inconsistent Testimonies" Sub-Claim

               vi.    Residual Sub-Claims

           b-5.    Claims Based on Dansby's Testimony

                 i.     The "Killing-His-Own-Son" Sub-Claim

                ii.    The "Robbery-of-Dansby" Sub-Claim

               iii.    "The-Word-'Everyone'" Sub-Claim No. I

               iv.    "The-Word-'Everyone'" Sub-Claim No. II

           b-6.    Claim Based on Jones' Testimony

    3.    Claims Raised Exclusively Against Petitioner's Appellate Counsel

        a.     Sub-Claim Based on the Prosecutor's Opening Statement

        b.     Lack-of-Trial-Severance Sub-Claims

    4.    "Cumulative Error" Set of Claims

        a.     "Cumulative Error" Sub-Claim

              i.     Lack of Petitioner's Legal Position

              ii.    Applicable Test

             iii.    Petitioner's Claim is Without Merit

        b.     Mislabeled "Insufficiency-of-Evidence" Sub-Claim

  D.    Certificate of Appealability

V.    Conclusion

## I.    STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

4

A district court must give deference to determinations of state courts. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits"[1] in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law [as it is interpreted or] set forth in [the Supreme Court's, rather than in any state court's or any circuit court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

_____

[1] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever; such determination is nonetheless subject to same degree of deference for the purposes of the court sitting in habeas review. See Harrington v. Richter, 2011 U.S. LEXIS 912 (U.S. Jan. 19, 2011).

In other words, under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively, which means that an application may be incorrect, but still not unreasonable. Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## II.   PROCEDURAL POSTURE AND SUBSTANTIVE FINDINGS

After Petitioner and his co-defendant, Joseph Brown, a/k/a "Crazy Joe" ("Brown"), were convicted in connection with the killing of Franklin Powell, Petitioner appealed his conviction to the Appellate Division. Upon the Appellate Division's affirmance, Petitioner sought certification from the Supreme Court of New Jersey, which was denied. Petitioner's post-conviction relief ("PCR") application followed and was denied by the Law Division. Petitioner appealed that denial and obtained the Appellate Division's reversal of the Law Division's PCR determination. In response to that, the State sought and obtained certification, and the Supreme Court of New Jersey, in a unanimous decision, reversed the Appellate Division's determination, hence

6

reinstating the outcome reached by the Law Division.[2]  The instant habeas action followed.

A.   **Factual Background**

1.   **Events Associated With Petitioner's Conviction**

Both the New Jersey Supreme Court and the Appellate Division provided their respective

summaries of underlying facts.  See State v. Echols ("Echols-NJSC"), 199 N.J. 344, 350-51

(2009), and State v. Echols ("Echols-NJAD"), 2005 WL 3078494, at *11-13 (NJ. Super. Ct.

App. Div. Nov. 17, 2005).  Although it appears that the summary provided by the New Jersey

Supreme Court is more reflective of the underlying facts than the summary rendered by the

Appellate Division, a mere quotation of the former would be excessively brief for the purposes of

this Court's habeas review and, hence, this Court's own summary of facts is warranted (with an

express notation that this summary is further supplemented by the finer facts detailed in the next

subsection of this Opinion).

On September 3, 1994, during the dark late evening hours,[3] two assailants entered

Franklin Powell's home and shot and killed Powell as he was running upstairs, seemingly in an

---

[2]  Respondents' submissions made in this matter included Respondents' answer and numerous exhibits.  See Docket Entries Nos. 11, 15-19.  While these submissions suggest Respondents' good faith efforts to docket all relevant exhibits, it is apparent that such efforts resulted in a modest success at best.  Indeed, a number of exhibits identified as "attached" are simply omitted from the entries actually made, while other submissions appear to be substituted by a mere second copy by Respondents' brief.  Therefore, to the degree this Court's attempts to identify the attachments succeeded, the Court will refer to the submissions made by their docket numbers.  However, the Court's references to all state court decisions available online are made accordingly in order to simplify the task of source location.

[3]  The events at issue took place at 10:25 p.m., in Newark, New Jersey.  Sunset on that date took place three hours prior.  See << http://www.timeanddate.com/worldclock/astronomy. html?n=861&month=9&year=1994&obj=sun&afl=-11&day=1>> (indicating that, on that date in 1994, sun set in Newark at 7:26 p.m.)

effort to protect his sister (who was left unharmed). Although Powell's sister, being blocked by a door, did not see the assailants, and the faces of the assailants were seemingly covered, they were later identified as Petitioner and Brown, who were arrested five days later (on September 8, 1994). Upon his arrest, Petitioner gave statements to the police: (a) asserting that Petitioner and a number of people were in a parking lot in front of Powell's house, and that he fled the scene after shots were fired; (b) identifying a certain Keith Eutsey as the person who entered Powell's home and, hence, implicating Eutsey in the murder;[4] and (c) making an unsolicited utterance that Petitioner "did not shoot nobody."[5] Petitioner was subsequently released on bail (and remained on bail for a considerable period of time), while Eutsey was arrested and charged with Powell's homicide. Later, however, Petitioner admitted to a private detective employed by Eutsey's attorney that he had falsely accused Eutsey. The charges against Eutsey were later dropped.

The investigation of Powell's murder revealed, inter alia: (a) Petitioner and Brown were members of a drug-dealing group known as the "Hit Squad," which was selling "clips" (ten vials) of cocaine for $50; and (b) Powell, known in those circles under his alias "Quill," had begun undermining the Hit Squad's "business operations" by selling, on what the Hit Squad considered its own "territory," the same "product," i.e., ten vials of cocaine, at the "discount" price of $35. Both sides agree that the murder was executed by the Hit Squad with an unambiguous aim to stop loss of "profit" caused by Powell/Quill's competition.

---

[4] According to Petitioner, Eutsey was known under an alias "Shawny."

[5] Petitioner made his "I didn't shoot nobody" utterance at the closure of his statement to the police, specifically, after all questions he was asked were answered, and – for merely prophylactic purposes – Petitioner was asked whether he wished to add anything to his statement. In response to that prophylactic inquiry, Petitioner stated, "I didn't shoot nobody."

8

After Powell/Quill's murder, three people, Shalika a/k/a "Mikey" Thomason ("Thomason"), Ada Dansby ("Dansby"), and Tracie Irvin ("Irvin") also made statements to the police.[6]  The statements made by Thomason, Dansby, and Irvin either suggested or outright indicated that Petitioner was one of the two Powell/Quill's assailants.

### 2.  Petitioner's Trial

Petitioner and Brown's trial lasted eighteen days, producing a voluminous record. Petitioner elected not to testify.  The statements made by counsel on both sides are too lengthy to be replicated in this Opinion.  However, a replication of certain excerpts of relevant colloquy, witness testimony as well as statements by the judge and counsel is warranted.

### a.  *Prosecutor's Opening Statement*

Following the initial judicial statements, the prosecutor had a discussion with the trial court and then delivered his opening.  During the pre-opening-statement colloquy, the prosecutor clarified the goals of his opening statement as follows:

> Considering this is the case where many of the witnesses have given recantation, the [S]tate's theory is . . . that you have to look at the totality [to] see a pattern here. . . . For example, . . . Thomas[on] . . . is . . . kidnapped [and t]hen[,] ultimately she says, "Well, no, the murder didn't happen, and the kidnapping did not happen." You have Darnell Jones [w]ho gives two statements to the police. In the second statement he says the reason he didn't identify [Petitioner as the murderer in his first statement was because] he's scared of [Petitioner].  Then, [Petitioner makes bail and is no longer] in custody[,] and [Jones] gives a recantation. . . .What we have here is a pattern[,] a pattern of [Petitioner's] on-going ability to put fear into witnesses.

---

[6] Thomason was one of Petitioner's former girlfriends with whom Petitioner allegedly, fathered a child.  Dansby also appears to have been one of Petitioner's girlfriends at that time; Petitioner also fathered a son (named "Shaquill") with Dansby.  Irvin had a daughter fathered by Powell/Quill; the statements made in the transcript suggest that Irvin was Dansby's god-sister and acquaintance.

9

Docket Entry No. 15-9, at 4.

Then, during his rather lengthy opening, the prosecutor stated:

[A]s you can expect when dealing with [an inner-city "ghetto"] situation[,] I don't have . . . priest[s] . . . who are going to be witnesses. . . . [Y]ou can imagine the lay witnesses who are [living] in the area. Who do we have? Well you are going to hear from a witness by the name of Darnell Jones who was known as Boo-Boo . . . . Darnell Jones says that . . . Brown [whom Jones] identifies . . . as ["]Crazy Joe["], . . . was involved in the killing of . . . Powell. . . . [T]he following day [Jones] comes [to the police] and says, ". . . I was scared of [Petitioner, but now I am letting you know that Petitioner] was also involved in that [murder. But,] subsequently[,] while he was in jail on his own charges[, Jones] gives a statement to an investigator working for . . . Brown[,] "I made it all up." . . . Well, some interesting things happened in this case . . . . Witnesses start saying it didn't happen. [Petitioner implicates Eutsey to] get himself out of jail and[, once Petitioner is released,] witnesses start saying [Petitioner's involvement in Powell/Quill's murder] didn't happen. . . . [F]or example, . . . Thomason, she was the girlfriend of [Petitioner] and, apparently, he had acknowledged to her what he did. . . . [But later on] Thom[a]son gets a visit from [Petitioner]. And while he is in possession of guns, he takes out a pen knife, pokes [her] and says, . . . "I'm going to do time based on you telling on me," and she gets kidnapped. [In connection with this kidnapping incident, she] was interviewed . . . regarding all the information she knew about the homicide [of Powell/Quill, and made statements about this "I'm going to do time based on you telling on me" line. But,] subsequent[ly,] . . . as happens with a lot of witnesses [in this case, she recanted, first, the kidnapping allegation, and then she recanted her statements about the homicide, stating] "Oh, I made everything up." . . . Also, [there is Dansby. Petitioner] is the father of . . . Dansby's son. [Dansby made a statement to police indicating that Petitioner threatened to kill their] son[, that Petitioner's] words were, "I'll do to him what I did to Quill." [But then Dansby, too, recanted her statement about the threat.] You are going to have all these statements. As I said I'm telling you right up front, you are going to have people say it didn't happen . . . . Listen to everything with an open mind. These [witnesses] are not people who like you are able to sit in a fairly nice courtroom in Essex County. The sheriff officers are here, so that you can feel safe and comfortable. You know that nothing is going to happen to you. . . . Think about people who are living in the community [where the murder of Powell/Quill happened] and why [these people] might [think], well, my son is more important. My life is more important. [I'll better say "]I never saw nothing.[" Because] I don't want to be involved anymore. . . . Keep an open mind. That is all I'm going to ask at this point.

Id. at 11-12.

10

**b.     *Testimonies of Witnesses Called by the State***

Prosecuting Petitioner and Brown, the State presented a lengthy array of witnesses.  The Court will summarize only four of them, i.e., Jones, Irvin, Thomason and Dansby, to provide the proper context for the Court's analyses.

i.      Jones' Testimony

Jones was the first witness called by the State.  Initially, he refused to testify to anything, even to the fact of his presence at Petitioner's trial, attempting to invoke the protections of the Fifth Amendment.  His attempts, however, were not successful. See Docket Entry No. 15-11, at 7-9.  Being found in contempt of court, Jones – who at that point was serving his sentence on unrelated aggravated assault charges – was sentenced to six-month contempt-based imprisonment to run consecutively to the sentence he was then serving.  See id.  The judge presiding over Petitioner and Brown's trial provided Jones with a five-day window of opportunity to purge himself, and so Jones did eventually testify at the end of the State's case. See Docket Entry No. 15-17.

In his testimony, Jones – being presented with two of his statements to the police identifying Petitioner and Brown as Powell/Quills' assailants – recanted all his statements implicating Petitioner and Brown.  See id. at 4-15.  Specifically, Jones asserted that every word in his both statements to the police were a product of Jones' lie, but then confirmed correctness of such basic information as: (a) Jones' name, address, age, education; (b) his aliases ("Wali Duncan" and "Dino"); (c) his receipt of Miranda warning prior to giving each of these statements; and (d) his description of a "clip" as ten vials of cocaine, etc.  See id.  In addition,

11

Jones confirmed his signature on these statements, his opportunity to read all his statements, his understanding of his rights and the authenticity of his initials after each sub-statement. See id.

However:

(a)     Jones testified that he lied in his statements to the police about him being at the scene of –

or even in the approximate vicinity of – the crime scene on the night of Powell/Quill's

murder and, hence, that he lied about his ability to witness anything;[7]

(b)     Jones testified that he also lied in his statements to the police concerning a meeting that

took place on the day prior to Powell/Quill's murder between Jones, Brown and two

individuals referred-to as "Rab" and "Darkman," during which these attendees discussed

the drop in "business profit" the Hit Squad was suffering as a result of Powell/Quill's

"competitive" business operations;

(c)     Jones testified that he also lied in his statements to the police about Brown making a

statement, "I don't like this mother f-cker" (with regard to Powell/Quill) in Jones'

presence;

(d)     Jones testified that he also lied in his statements to police about his knowledge of the

identity and number of Hit Squad members, as well as his, Petitioner, and Rab's

membership in the Squad;

(e)     Jones testified that he also lied in his statements to police about his knowledge that each

member of the Hit Squad was paid $300 per each thousand vials sold;

_____

[7] However, in response to Petitioner and Brown's counsel's questions as to the events of the night of the murder, Jones stated that he actually saw two assailants, hence implicitly verifying that he was at the murder scene. See Docket Entry No. 15-17, at 23.

12

(f)     Jones testified that he also lied in his statements to police about his knowledge that the

Hit Squad was employing morning, day and evening shifts of drug sellers;

(g)     Jones testified that he also lied in his statements to the police about seeing Petitioner and

Brown running toward Powell/Quill's house immediately prior to the murder and also

lied about seeing Brown breaking into Powell/Quill's place, at the very time when

Petitioner was breaking into Powell/Quill's house from the back door;

(h)     Jones testified that he also lied in his statements to police about hearing gunshots within a

minute or two after the break-in;

(i)      Jones testified that he also lied in his statements to police about Brown's use of the Uzi

gun during the attack on Powell/Quill;

(j)      Jones testified that he also lied in his statements to police about seeing the very same Uzi

gun in Brown's hands thirty minutes prior to the murder, i.e., at the time when Brown had

pointed the gun at Rashine Donaldson a/k/a Aaron Donaldson a/k/a Boo-Boo; and

(k)     Jones testified that he also lied in his statements to police about running away from the

crime scene, and about seeing two people, with their heads covered by sheets (with eye-

openings cut-out), who were running from the crime scene and jumping over a wall

toward the graveyards.  See id.

In response to the prosecutor's question as to why Jones so elaborately lied in his

statements to police, Jones responded that "[he] and [Brown] never got along," and that Jones

owed Brown and Petitioner "some money" after losing a game of dice, so Jones welcomed the

opportunity to frame Brown and Petitioner with regard to Powell/Quill's murder in order to "get

back" at Brown and also to get rid of his alleged debt to Petitioner and Brown.  Jones testified

13

that he lied about all the details of the murder and all the details of the Hit Squad's operations and membership to make his lie more believable. While Jones' statements to the police indicated, in no ambiguous terms, Jones' fear that Brown and Petitioner would retaliate against him for his identification, Jones recanted that position, testifying that his statements to that effect were, too, a lie, and he had absolutely no fears of Petitioner or Brown. See id. at 15. He did not explain his reasons for that alleged lie.

ii.    Irvin's Testimony

Irvin, whose daughter was fathered by Powell/Quill, provided the following testimony:

Q:    . . . [W]ere you in the area of 279C Broadway in the City of Newark on the
      night that [Powell/Quill] was murdered?
A:    Yes.
. . .
Q:    And you told police that . . . you did not observe the shooting.  Correct?
A:    Yes.
. . .
Q:    Did – at some time that evening, did you see [Petitioner]?
A:    Yes.
Q:    Do you recall the time you saw [Petitioner]?
A:    I saw [him] at 9:30 [p.m.] and after they took [Powell/Quill] to the
      hospital.

. . .
Q:    Now, ah, after [Powell/Quill] was shot, where did you see [Petitioner]?
A:    He was running from the backyard of 279C[,] jumping in the cab . . . .
. . .
Q:    On . . . May 20th, 1996, did you make a complaint to . . . police . . . ?
A:    Yes.
Q:    . . . [W]hy did you make a complaint . . . ?
A:    [Petitioner] had threatened me.
Q:    . . . [A]nd what did [Petitioner] say at that time to threaten you?
A:    He told me to shut the f-ck up, you stupid bitch, or I'll f-ck you up.
Q:    Those were his exact words?
A:    Yes.
Q:    Did he say anything else?
A:    Yes.  After I respond[ed] to that.
Q:    . . . And what did he say?

14

A:     He'd kill me if I keep talking.

Q:     . . . [W]hat that was in reference to?

. . .

A:     'Cause what happened to [Powell/Quill] being killed.

Docket Entry No. 15-11, at 44-47.

### iii.     Dansby's Testimony

Dansby, the mother of one of Petitioner's sons (the one who was named Shaquill),

initially thought she would not be called to testify, but – being brought, against her hopes, to the

court by the State's investigator – testified as follows:

Q:     [You reviewed the statement you gave to police.]  Does that refresh your
       recollection as to what happened on the evening of [Powell/Quill's]
       murder?

A:     . . . I was not there.

Q:     . . . Did you tell the police in the statement that you were there?

A:     No, I did not. . . .

Q:     I'm gonna ask you to refer to [your statement].  Did you ever tell the
       police, I know [Petitioner] did it.  I saw him get into a cab after I heard
       some shots . . . ?

A:     I don't remember saying that but this is what the statement say, but I don't
       recall saying that.  But . . . that's what it says right there --

Q:     You don't recall ever giving that statement?

A:     I don't remember, no.

Q:     Do you recall telling police that [Petitioner] admitted to the murder of
       [Powell/Quill]?

A:     No. . . .

Q:     I'm gonna refer your attention to [your statement.]  Didn't you tell police
       that [Petitioner] was bragging about it, that they didn't have any evidence
       against him and he was going to walk. [That Petitioner effectively]
       admitted to killing [Powell/Quill] when [Petitioner] said what he was
       going to do to [Shaquill], like he did it to Quill.  Do you recall telling that
       to the police . . . ?

A:     No. . . . [I]t's here on this statement.  But no, I do not recall saying that.

Q:     Do you recall [Petitioner] saying that your baby should be dead because
       you named him Shaquill and he never liked the name Shaquill, so he killed
       Quill, so he could never approve of the name?

A:     No. . . . So many things have happened in my life, I don't even remember.

. . .

15

Q:   . . . Does seeing . . . your signature on [your statement] refresh your recollection that you did, in fact, give that statement?

A:   That's my signature . . . .

Q:   . . . [D]o you now recall actually making the statement?

A:   No, I don't remember. . . . I don't remember. I see my signature but I don't remember making the statement. . . . So, maybe I did. This is my signature. I'm not gonna say it's not. This is my signature, but . . . I don't know anything. I don't want to be a witness. . . . But so many things happen in my life, I don't remember this. Right after what happened to me this morning, I don't even really remember my name . . . . I didn't want to come down here. I'm all upset. I don't remember anything.

Q:   Did somebody hold a gun to your head this morning and told you to shut up?

A:   Yes.

Q:   And you told that to the investigator when she picked you up?

A:   Yes, I did. . . . I don't remember. Like I say, that's my signature. Of course, I had to sign it. That's my signature, but I don't remember. [Petitioner] is the father of my child. I love him deeply. Joseph Brown is my friend. . . . I may not be with [Petitioner], but [he is] the father of my child. I do care deeply about him and [Brown] and my own life and my children's life.

. . .

Q:   . . .[H]ow did you know [Powell/Quill]?

A:   He was the father of my god-sister's child.

Q:   . . . [Was] he also known as Quill? . . .

A:   Yeah. . . . He had a lot of names.

. . .

Q:   I'm gonna ask you to refer to [your] statement. Do you recall telling the police in answer to whether [Petitioner] killed [Powell/Quill], "Yeah, I know he did it"?

A:   No. I do not recall making that statement.

Q:   Do you recall telling police the day of the shooting, ["]I seen him get into a cab and leave["]?

A:   No, I do not. . . .

. . .

Q:   Well, I'm gonna ask you to look at page 2 of the statement. "Question: What else can you tell me about the killing of Franklin Powell?" Do you recall giving the answer: [Petitioner] was like bragging about it?

A:   No. . . . I only have a son by [Petitioner]. I don't hang around [Petitioner] . . . .

. . .

Q:   Did you tell police that everyone is scared of [Petitioner]?

A:   No.

16

Petitioner's counsel:  I . . . object to that hearsay remark. . . . [T]hat's hearsay and it's very prejudicial.

. . .

Court:      I'll overrule the objection.

. . .

Q:     Do you recall telling police . . . everyone is scared of [Petitioner]?

A:     . . . I said, no. . . . Like I said, I don't even remember this. I see my signature and I can't say that that's not my handwriting because I write like that, but I don't recall it. No, I don't. And I'm gonna keep saying I don't recall it 'cause I don't remember it. . . . I don't remember making this. Maybe, I did; maybe, I didn't. I don't remember it. . . . I don't remember nothing about this incident. . . .

Q:     . . . Isn't it true that you were the person who called the police to give this statement?

A:     No. Prosecutor's came out to my house and got me. . . .

. . .

Q:     . . . [Y]ou said that the Prosecutor's Office [came to] you and you never called police. I'm gonna show you ah, a police report by Officer Perez. [D]oes that refresh your recollection that you called the police about threats that [Petitioner] had made on you? . . .

. . .

A:     No. . . . I understand. I know how to read but I'm saying, no. No, I don't remember it – I don't remember making this one either. I'm saying, no. If I don't remember, I don't remember. Can't nobody make me remember. . . . I know my signature, but I don't remember making it. No.

. . .

Q:     So, you don't recall telling ah, Officer Perez that when [Petitioner] told you, I'll do [Shaquill] like I did Quill [and that Petitioner] grabbed your throat?

A:     No.

Q:     Do you recall . . . telling the officer that you fell to the ground when he grabbed your throat?

A:     No.

Docket Entry No. 15-11, at 15-20.

iv.    <u>Thomason's Testimony</u>

Thomason, one of Petitioner's girlfriends, testified on direct and redirect examinations as follows:

Q:     . . . [W]ere you with [Petitioner on the day of the murder]?

17

A:      Yes.

Q:      . . . [D]id you see him go to 279C Broadway?

A:      No.

Q:      Did you hear gun shots at that -- that location?

A:      No.

Q:      Did you give a statement to police [a few months later] regarding that [murder] incident . . . ?

A:      . . . [Y]es.

. . .

Q:      Did you also [include in your] statement [information] regarding [your] being kidnapped by [Petitioner]?

A:      Yes.  I ain't say he kidnap me, though.

Q:      [But you were talking about you being t]aken away from your home at knife point. . . .

A:      . . . This was so long ago, I don't even remember about that kidnapping. . . .

. . .

Q:      Now, . . . why were you in the police station that day to give a statement?

A:      Ah, they came to . . . his house [where Petitioner took Thomason] 'cause of the kidnapping.  And when they got me down there, they start questioning me about the homicide.

Q:      Well, the first thing they questioned you about was . . . kidnapping. . . .

A:      . . . They came there and got me from [Petitioner's] house.

Q:      You didn't call the police [to] indicate you had been taken against your will[?]

A:      No. [Jamillah Jackson ("Jamillah"), who was at Thomason's place on the date of kidnapping,] called, that's who called.

. . .

Q:      . . . [W]hen they took you down to the police station . . . , first thing they did was take a statement regarding a kidnapping. . . .

A:      Yes.

Q:      Do you recall what you told them that [Petitioner] did at that time?

A:      I remember I told them, don't lock him up for kidnapping me . . . .

. . .

Q:      . . . [D]oes [your statement] refresh your recollection that . . . [Petitioner] kidnapped you at knife point?

A:      Well, they kind of put it in they own little words [in the sense that Thomason described the facts, and the police officers correlated the described facts to the offense of kidnapping]. . . .  I ain't say [the word] kidnapped. . . .  They just asked me what happened, how I wind up at his house . . . .  They put in they own little words [i.e., used the word "kidnapping"].

Q:      So, you're saying that's not what you said to the police?

18

A:    No, not exactly.

Q:    Well, you said not exactly. . . . Did you tell the police that [Petitioner] came in and . . . threw clothes to you and told you to get dressed. . . . Did [Petitioner], while he was waiting for you to get dressed after he. . . had thrown the clothes, did he tell Jamillah . . . to shut up, bitch?

A:    Yeah.

Q:    . . . And he said, Shut up, bitch, before I f-ck you up. Isn't that correct?

A:    . . . I know he say shut up, bitch. They was arguing back and forth. . . . I don't remember exactly . . . I know he said shut up, bitch. I remember that.

. . .

Q:    Do you remember telling Jamillah . . . to call the cops?

A:    Yeah, 'cause I wanted [the police] to come [to] make [Petitioner] leave.

Q:    So, . . . when you said before you never asked anyone to call the police, that wasn't true?

A:    . . . I said I ain't tell [the police] that he kidnap me . . . . I told [Jamillah] to call the cops so they could come to my house and make him leave.

Q:    . . . [D]o you remember telling the police that he used [a] pen knife to force you to leave the house?

A:    . . . I said . . . . he poke me [with the knife].

Q:    . . . [Y]ou told . . . to police [that Petitioner p]oked you in the arm trying to make you leave with him?

A:    [I said] trying. . . . [But I am now claiming that] I went [not because I was poked with the knife, but] 'cause I wanted to go . . . .

Q:    So, it had nothing to do with him pulling a knife on you?

A:    No. . . .

. . .

Q:    Now, that night, did [Petitioner] tell you that you were the reason he would be going to jail?

A:    No. He ain't say it like that. He said this probably be the last time I'm gonna get to see him, that's why he wanted me to come up there with him.

. . .

Q:    [In your statement, y]ou told the police, . . . he said tomorrow I'm gonna get locked up and do about 25 years 'cause you told I killed somebody. Do you recall saying that to police?

A:    Yes.

Q:    So, that's what [Petitioner] had said to you[?] . . .

A:    No.

. . .

Q:    [On the evening when Powell/Quill was murdered, d]o you remember being in the area of 279C Broadway?

A:    Yes.

19

Q:    And do you remember being with [Petitioner?  You were asked by the police]: In your own words, please tell me what knowledge you have regarding the shooting death of [Powell/Quill]? . . . Now, do you recall . . . what you [said you] saw . . . with regard to the shooting death of [Powell/Quill]?

A:    Yes.

Q:    Do you now recall [stating that Petitioner] told [you] to call a cab . . . ?

A:    I told 'em that because I wanted to [lie].

Q:    Not because it was the truth?

A:    No. At this time, . . . we was going through a little thing and he had a baby on me [i.e., Dansby had a son from Petitioner]. And at the time, I felt if I couldn't have him, I ain't want nobody with him. . . . So, yeah, I told [the police the actual content of Thomason's statement]. It was like a lover's quarrel. He had a baby on me so I felt that was my way to get back on him.

. . .

Q:    Okay. And you told [the police detective] when the cab came, [Petitioner] told you to wait 'cause he had to do something?

A:    Yes. . . .

Q:    And you told [the police detective] that -- right after [Petitioner] said that [Thomason should wait for him with the cab, Petitioner] and his friend, Joseph Brown, went into the alleyway and five minutes later came back out with shirts tied around their face. Do you recall saying that to the police?

A:    Yes. . . .

Q:    Do you recall further saying: [while] I was holding the cab and [Petitioner and Brown] ran past me with their shirts tied around their face[s] . . . on the porch of [Powell/]Quill's sister's house. . . .

A:    I just told you, yeah, I told 'em all that. . . .

. . .

Q:    You then told [the police detective that Petitioner] told [Brown, a/k/a] Crazy Joe . . . to go around the front of the house. They both went into the house. . . .

A:    Yes. . . .

Q:    You then told [the police detective] then no more than two minutes later, [you] heard gun shots?

A:    I told [the police] that.

Q:    Then you indicated about five minutes after that, [Petitioner] and Joseph Brown came running out the back door and out of the alleyway onto Broad Street?

A:    I told 'em that.

Q:    [You also stated that, l]ater on, [Petitioner] came back with a different set of clothes on and [told you] to come on?

A:    I told 'em that.

20

Q:  Now, that's because you were there.  Correct?

A:  No.  I wasn't there. . . .  I was mad [at Petitioner]. . . . I heard a lot of
people talking about [the murder of Powell/Quill] so I went by what
everybody else was saying.

. . .

Q:  [You stated to the police that Petitioner] came back with a different set of
clothes on and [told you] to come on. . . . And that wasn't 'cause
somebody else told you that [Petitioner] told you to come on?

A:  No.

. . .

Q:  . . . [Y]ou then told [the police detective] that you went to Broadway to
your cousin's boyfriend's house and waited for a cab? . . . And when the
cab came, you went to your house? . . . You just made that up?

A:  Yeah, I told [the police] that.  I just told you, I wanted [Petitioner] at this
time to get locked up 'cause we was going through some things.

Q:  But you're saying you made that up out of your own head 'cause no one
else could have told you what you were doing.  Right?

A:  . . . Now, on the part about . . . my cousin's boyfriend's house, yeah.  I
made that up.  But the rest of it, I heard by what everybody else was
saying.  So, I went by what everybody else was saying.

Q:  So, do you recall telling police when we got to my house, I asked
[Petitioner] why he killed the man and he said he didn't mean to kill him?

A:  Yeah.  I told them that. . . . I also just told you that I told 'em that because I
was mad and I wanted them at the time to lock him up, so I'm gonna tell
'em what I'm telling 'em things for them to lock him up.

Q:  You're now saying you wanted to lock him up but you said you didn't
want to press charges for kidnapping?

A:  I said for the kidnapping, yeah, that's true.

Q:  So, . . . you didn't want to lock him up for kidnapping but you did want to
lock him up for murder?

A:  Yeah. . . .

Q:  So, even though you gave a statement regarding the kidnapping which you
said was not true, that wasn't to get him locked up?

A:  No. . . .

. . .

Q:  So, did you also tell the police, I kept saying to [Petitioner], why did you
kill him and he told me to mind my own business, don't worry about it?

A:  Yeah, Yeah, I told 'em that.

. . .

Q:  Do you remember [making a statement to the police as to whether
Petitioner,] after that night, say anything else [to you] about the shooting? .
. . And ah, specifically, you told police [that] after [Petitioner was released
on bail] from jail he called [you] and [you and him] spoke on the phone.
[You stated,] I asked him if . . . he thought I had told about what happened

21

and he said[,] at first, [he] thought you told but now [he] found out who really told on [him].  Do you recall telling the police that?

A:    Yes.

Q:    And that happened.  Didn't it?

A:    No.

Q:    Okay.  So, that conversation [too] never occurred either?

A:    No.

. . .

Q:    Remember being asked [by the police] why did you wait to come forward to give this statement?

A:    Yes.

Q:    And do [you] remember telling . . . [that] you felt it was the right thing to do, 'cause [Eutsey/]Shawny [who was framed by Petitioner] did not shoot [Powell/Quill.  You also stated that, because Petitioner was] a father [of your] child and [you] didn't want [your] son to be . . . without a father [you said you] kept qui[et for so long].  That's not what you said to police?

A:    . . . I said it, yeah, I said that.

Q:    But that's not true either?

A:    No. . . . But, yeah, I said it.

. . .

Q:    . . . [Y]ou indicated that the reason you gave the statement [to the police] was because [Petitioner] was cheating on you?

A:    Yes.

Q:    And that was why you wanted him locked up [when you gave the statement]?

A:    He had a baby on me, I said. . . .

. . .

Q:    Would it refresh your recollection to be told that . . . Dansby gave birth on August 28th [that is, a week before murder of Powell/Quill]? . . . And you're saying the reason you came forward November 10th first time . . . to give information on the homicide was because on November 10th, you decided that you were [suddenly so] mad at him for having the baby [with Dansby two and a half months ago]?

A:    We was going through a bunch . . . of stuff. . . .

Q:    . . . [Y]ou remember speaking to an investigator for [Petitioner's] attorney?

. . .

A:    Yes.

Q:    . . . [Y]ou told [us] . . . today . . . [the] kidnapping . . . never happened and [Petitioner] didn't force you to go. . . . [You said the same thing to the investigator working for Petitioner's attorney.] You gave that statement to help out [Petitioner].  Correct?

A:    Yes.

22

Q:    And in that statement [in which you aimed to help Petitioner against his kidnapping charges], you nonetheless stated that he forced you to go with him on [the date of the kidnapping]. . . .

A:    Yeah. . . .

. . .

Q:    Now, when you were talking to the investigator for [Petitioner's] attorney . . . , at that time you didn't say that the information you gave [to the police] regarding the homicide was untrue. Did you?

A:    He ain't ask me nothing about no homicide.

Q:    And you didn't say, you know what? I also gave a [false] statement regarding a homicide [in addition to giving an allegedly false statement about the kidnapping, and so] I'd like to take that back [too]?

A:    No.

Docket Entry No. 15-12, at 9-40.

In addition, Thomason testified during cross-examination by Petitioner and Brown's counsel. During Brown's counsel's cross-examination of Thomason, the following testimony and colloquy took place:

Brown's Counsel, Q:  Did the police indicate to you that Mr. Brown was implicated in the homicide?

A:    Yes.

. . .

Q:    And those police[men who] talked to you, they knew the details about that homicide? Correct?

A:    Yes, they . . . told me something that he was – he raped somebody. They told me a bunch of stuff. They ain't say Brown. They say [Petitioner]. They say he raped a little girl. . . .

. . .

Q:    So, is the police that started talking to you about the homicide?

A:    Right.

Q:    . . . They told you . . . that they know you have information [about the homicide]?

A:    Yeah. They said, you was his girlfriend at the time. And they already knew my name and everything. And then they said, why would you want somebody like that to be a father – no. Why would you pick somebody like that to be a father of your son? They was bad mouthing them. They did not say nothing about [Brown]. They just was talking about [Petitioner]. They was saying he raped little girl –

23

| Prosecutor: | Judge, I'm gonna object. It's . . . all hearsay of what she alleges police officers said. That's hearsay. It's not what they say. |
| | . . . |
| Court: | All the items – ladies and gentlemen of the jury, whatever this witness may have said is based upon what other people may have said. It's obviously not before you for the purpose of the truth of any of these statements and you should disregard them. On the other hand, those items are properly before you for the purpose of this witness' explanation of the differences between the statements and to assist you in determining credibility. Umm, but if you believe that the information that she got was acquired from third parties and not based on her own personal knowledge, then you should disregard that. |

Id. at 25-26.

### c.   *Testimony of Smallwood*

Petitioner's counsel, Mr. DeBlis ("DeBlis"), also presented an array of witnesses. For the purposes of this Court's review, only witness's testimony warrants replication. At some point either during his polygraph test and/or as part of a statement to the police, Petitioner mentioned that, at the time of the shooting, Petitioner was within sight of a certain "Rasheed" or "Rashine" ("Rasheed/Rashine"). Interpreting this statement as a reference to Rashine Donaldson a/k/a Aaron Donaldson a/k/a Boo-Boo ("Donaldson"), DeBlis made inquiries into Donaldson's statements and concluded that those statements could not qualify as Petitioner's alibi. Consequently, no notice of alibi was filed under the state procedural rules, and the theory advocated by DeBlis was that Powell/Quill was murdered by two other individuals, one of whom could have been Shawny (i.e., Eutsey), in accord with Petitioner's original (but later revoked, as false) statement implicating Eutsey in the murder.

Not long prior to Petitioner and Brown's trial, DeBlis – exploring whether the reference to "Rasheed/Rashine" referred not to Donaldson, but rather to another individual known in some

24

circles as Rashine Smallwood ("Smallwood") – added Smallwood to the list of witnesses he

intended to call.  Smallwood was, at the time of Petitioner's trial, in prison awaiting sentencing

on certain unrelated charges.  As a result, DeBlis only succeeded in locating Smallwood shortly

prior to the beginning of trial.  Consequently, Smallwood's testimony was presented closer to the

end of the defense's case and consisted of two parts: one submitted during the preliminary

hearing, outside the presence of the jury, and the other presented directly to the jurors.


          i.        Outside-the-Jury Colloquy and Testimony

During the preliminary hearing, the following exchanges took place between the court,

the prosecutor and DeBlis (and also included Smallwood's following statements):

| | |
|---|---|
| DeBlis: | Smallwood would say if he were called, I assume, that he was out there in the rear when this happen[ed] and with him was Jamine Nelson, Raymond George, Ramon, [Petitioner] and he heard some shots and -- |
| Prosecutor: | Judge, this is an alibi . . . |
| . . . | |
| Court: | Mr. DeBlis, is this an alibi? |
| DeBlis: | No, sir. |
| Court: | Why not? . . .  Is he going to say he was . . . with [Petitioner] when he heard the shots fired? |
| DeBlis: | No. . . . I said that he was in the rear side yard of, behind 279C Broadway.  He said he saw Raymond George, Ramon, Jamine Nelson and [Petitioner].  He wasn't with them.  He said he heard shots and he saw everybody run.  To the best of what he told me, he did not say [that he and Petitioner] were together. |
| . . . | |
| Court: | Why don't we bring over Mr. Smallwood and see what [exactly] he has to say . . . . |
| . . . | |
| DeBlis: | It is my understanding that Rasheed end Rashine are the same person.  That [Petitioner] calls [Smallwood] by both names. . . . |
| . . . | |

| | | |
|---|---|---|
| DeBlis, Q: | Now, I am going to invite your attention back to . . . September 3rd, 1994 at about 10:00, 10:30 in the evening in the area of 279C Broadway.  Remember that night? |
| Smallwood, A: | Yes. |
| Q: | . . . Where were you? |
| A: | In the parking lot, sir. |
| . . . | |
| Q: | And tell me what you heard in the parking lot at that date an time. |
| A: | Gunshots. |
| Q: | How many? |
| A: | I can't remember how many. I heard a couple, a lot. |
| . . . | |
| Q: | After you heard the gunshots, what did you do? |
| A: | Ran. |
| Q: | . . . When you heard the gunshots, did you see anybody else around? |
| . . . | |
| A: | Oh yes.  When I ran we got down the end of Broad Street, it was me, Jamine, Raymond and [Petitioner]. |
| . . . | |
| Q: | Okay.  Did you see a gun in [Petitioner's] hands? |
| A: | No. |
| . . . | |
| Prosecutor, Q: | What time did you say you arrived in the area of 279C? |
| . . . | |
| A: | I was out there for like two hours. |
| Q: | And that's two hours before the shooting? |
| A: | Yes. |
| . . . | |
| Q: | So, you're testifying now that at all times you were with [Petitioner]? |
| A: | I was around him, he was in my sight, my eye sight. |
| Q: | He was within your sight the whole time? |
| A: | Yes. |
| Q: | And he never left your sight within this two hour period? |
| A: | Yes. |

Docket Entry No. 15-20, at 6-8.

After this testimony, the following colloquy took place:

| | |
|---|---|
| Court: | [Prosecutor,] are you going to object to this witness being allowed to testify? |
| Prosecutor: | Yes . . . .  This is an alibi witness. . . . |

| | |
|---|---|
| Court: | Mr. DeBlis, do you claim that today is the first time that you know that your client had an alibi? |
| DeBlis: | Yes. . . . [T]he statement that [Petitioner] gave . . . refers to ["]a["] Rashine. As the prosecutor pointed out, . . . Rashine could have been Booboo, Rashine[/Aaron] Donaldson. It was not until the actual beginning of jury selection that I fettered out in a discussion with [either the prosecutor or Brown's defense] counsel that this ["]Rashine["] could very well be this [other] man who is in state . . . custody. . . . Until I spoke with [Smallwood], actually spoke with him[,] I didn't know he was even the same guy who would say that ["]I was . . . out there["] . . . . As you know, this case is loaded with street names, acronyms, other names. Every witness who has testified has a variety of different names and I can only represent to Your Honor that I did the best I could to determine the identity of all these people . . . . [Here, I had] just one word, ["]Rashine[," to] find out who he is and where he lives and whether he's incarcerated . . . . |
| Brown's counsel: | . . . I can attest that about four or five times during the course of the trial Mr. DeBlis and I have both attempted to speak with this individual Rashine Smallwood. Your Honor will recall we brought it up several times after the trial began and ask[ed] that he be produced. The jail said they didn't have him under Smallwood, they had two other people under Smallwood, both of which . . . was not the [right] person. We were sent around and around attempting to speak with this individual. |
| Court: | All right, I'm satisfied. . . . [Therefore,] I will exercise my discretion to allow Mr. Smallwood to testify. |

Id. at 10-11.

### ii.   Testimony Before the Jury

As a result of the judge's determination, Smallwood testified in the jurors' presence. He

testified as follows:

| | |
|---|---|
| DeBliss, Q: | I am going to ask you to remember back to . . . September 3rd, 1994, 10:00, 10:30 in the evening. Remember that day? |
| A: | Yes. |
| Q: | And where were you at the time? |
| A: | In the parking lot. |
| Q: | Parking lot where? |
| A: | Broad Street at Broadway. |
| Q: | Is that in the area of 279C Broadway? |
| A: | Yes. |
| | . . . |

27

Q:    Now, were you with anybody in the parking lot that evening at that time?

A:    I was with a girl at that time.

Q:    Okay.  With anybody else?

A:    I was around Jamine Nelson, Raymond George and [Petitioner].

Q:    Okay.  And did something happen, did you hear anything?

A:    Yes, I heard shots.

. . .

Q:    And what did you do?

A:    I ran.

Q:    Did you see – did anybody else run?

A:    Yes.

Q:    Did you run together?

A:    Yes.

Q:    And who is it . . . who ran with you?

A:    Jamine Nelson, Raymond George and [Petitioner].

Q:    Okay.  At any time did you see a gun in the hands of [Petitioner]?

A:    No.

. . .

Prosecutor, Q: You said you saw [Petitioner] that night. . . . Do you recall the clothing he was wearing that night?

A:    No.

. . .

Q:    Did you see Joseph Brown that night?

A:    No.

Q:    Do you know someone named Shawny?

A:    Yes.

Q:    Do you know his real name?

A:    No.

. . .

Q:    Do you know someone named Booboo or Rashine Donaldson?

A:    Yes.

Q:    Did you see him that night?

A:    No.

Q:    Do you know somebody named Dino?

A:    Yes.

Q:    And his real name is Darnell Jones, is it correct?

A:    Would not know.

Q:    Did you see Dino that night?

A:    No.

Q:    And you're saying you were out at 279C and you didn't see Dino, you didn't see Booboo, you didn't see Shawny?

A:    No.  I said I was in the parking lot.

Q:    But none of those other people were there?

A:    My mind was focused on that girl I was talking to.

28

| | |
|---|---|
| Q: | So what girl was that you were speaking to? |
| A: | This girl name Shante. |
| Q: | What's her full name, sir? |
| A: | I don't know her full name. |
| . . . | |
| Q: | But do you know a last name? |
| A: | No. |
| Q: | Do you know where she lives? |
| . . . | |
| A: | No.  She came down with some other girl. |
| Q: | Do you know the other girl's name? |
| A: | No, I don't know her. |
| Q: | Do you know somebody by the name of Marv? |
| A: | Yes. |
| Q: | Was he out there with you? |
| A: | I think he was out there, I am not sure. |
| Q: | Now, you said you just saw [Petitioner].  Were you hanging out with him? |
| A: | No. |
| Q: | He wasn't with you at the time? |
| A: | No. |
| . . . | |
| Q: | And . . . you said that none of those people that I mentioned were with you.  Were they with [Petitioner], Booboo? |
| A: | No, sir. |
| Q: | What about Dino, . . . [w]hat about Shawny, was he with [Petitioner]? . . . Was Marv with [Petitioner]? |
| A: | No, sir. |
| Q: | And exactly what were you doing at the time you heard the shots? |
| A: | I was talking to the young lady [Shante]. |
| Q: | And other than the young lady and her female companion, no one else was with you at the time? |
| A: | No. |
| Q: | And when you heard the shots you were talking to her and then you ran? |
| A: | Yes. |
| Q: | And at some point when you were running you saw Petitioner running as well, correct? |
| A: | Yes. |

Id. at 12-16.

**B.**   **Trial Court's Additional Clarification to the Jury Charge**

29

The above-replicated excerpts present just a small part of the voluminous transcript of testimonies accumulated during the eighteen-day trial.  The following excerpt from a clarification to the jury charge also warrants quotation:[8]

> Ladies and gentleman of the jury, . . . [t]he note that you wrote to me yesterday [reads, "]we would like to know how long [Petitioner] has been in custody and for what?["]  And then in parentheses [you wrote, "in] this or another case.["]  I want to express my concern to you that you may not have fully understood my instructions to you.  So, let me remind you of a few items.  You will recall I told you before that a person – that – I told you before, the fact that a person may have been arrested and held in custody is no evidence of guilt and should not affect or play any part in your deliberations.  That is, that you may not draw any inference of guilt from the defendant's arrest or from any testimony that [Brown] or [Petitioner] may have been in custody at some time between [the date of murder of Powell/Quill] and today.  You may not draw any inference of guilt from such . . . custody.  First, it is only the evidence, the testimony, the exhibits in evidence and stipulations which you may consider.  The law is clear.  Whether or not a defendant is in custody or not suggests neither innocence nor guilt.  The fact that someone may have been in custody has nothing to do whatsoever with his guilt.  It has nothing whatsoever to do with his being dangerous.  Your parenthetical note

---

[8]  Shortly prior to charging the jurors, the Court strived to ensure that Petitioner, with his handcuffs removed, would have an opportunity to be present during the charge.  The following exchange took place (outside the jurors' presence) in connection with the trial court's endeavors:

| | |
|---|---|
| Petitioner: | I don't want to be here. |
| Court: | I'm gonna deny your request [to be absent during the charge]. |
| Petitioner: | There may be some further problems if you take the handcuffs off me. |
| Court: | Are you threat. . . -- are you threatening? |
| Petitioner: | . . . I'm just trying to look out for my best interest. |
| Court: | What do you mean, there may be same further problems? |
| Petitioner: | Because I don't want to be here.  You're holding me against my will. |
| . . . | |
| Court: | Mr. Echols, you're still under oath.  You understand that, sir? [Are you] telling me that you might present a security risk if your handcuffs [are] removed, is that what you're telling me, sir? |
| Petitioner: | Yes. |

Docket Entry No. 16-4, at 9-10.

to anther case requires me to emphasize again that you can only consider the charges pending before you here in this case. There may have been some reference to other complaints brought by . . . Dansby and . . . Thomason but I allowed testimony about these alleged incidents for a very limited purpose. What happened to those charges, whether they ever proceeded, whether they were dropped as . . . ultimately requested, at least according to testimony as I recall it, or whether they are still pending, is not the proper subject of your deliberations. You may consider these incidents, if they happened at all, only for the very, very limited purpose I explained to you. Again, the law's clear. It is essential that you not consider speculation which may well be wrong about the pendency of other cases in any way, shape, manner or form. You must put it out of your mind entirely. It may not have any bearing on and may not in any way enter your deliberations. Remember, it would be a violation of your sworn duty to base a verdict upon any view of the law other then that given in my instructions. Similarly, it would be a violation of your duty to base a verdict upon nothing but the proper evidence presented to you here in this courtroom. . . . [9]

Docket Entry No. 16-4, at 10-11.

### C.     <u>Determinations Made During Petitioner's PCR Proceedings</u>

As noted <u>supra</u>, Petitioner filed a PCR application, which was denied by his trial judge, reversed by the Appellate Division, and the latter was reversed, in turn, by the New Jersey Supreme Court, which reinstated the outcome reached by the Law Division.

#### 1.     *Law Division's Findings*

The decision entered by the Law Division as to Petitioner's PCR is very lengthy. Suffice it to say that the Law Division held, in relevant part, as follows:

The Appellate Division . . . fully dealt with the claim of error based upon the claim of ineffective assistance of counsel as to severance. . . . The very subtle alleged prejudice [from non-severance is based on] the redactions in [Petitioner's] statement (that [Petitioner] saw Brown enter the front of Powell[/Quill]'s apartment with an Uzi)[; but this claim] ignores the [fact] that to make use of that subtlety [Petitioner] would have had to accuse Brown of complicity [which would

---

[9] Other relevant instructions or statements made by Petitioner's trial judge to the jurors and incorporated in the PCR decisions of the Law Division and the Supreme Court of New Jersey are replicated in the next section of this Opinion.

be to Petitioner's detriment, since he was acquitted on the complicity charges. Moreover, i]n a separate trial, [Petitioner's] statement that he saw Brown enter Powell[/Quill]'s apartment through the front door merely corroborated the version given by [State's witnesses] and would have enhanced their credibility [to Petitioner's detriment]. . . . [Thus], there is no basis for a claim that trial counsel or appellate counsel was ineffective in failing to raise [the severance issue. Also, during Petitioner's direct appeal, Petitioner raised, and had dismissed, his claim that his] trial counsel was ineffective for failing to limit the jury's exposure to other crimes evidence and for allowing the State to introduce evidence that everyone was afraid of [Petitioner]. . . . First, the record is clear that trial counsel tried valiantly to bar almost all the complained of testimony. . . . At the PCR hearing, [Petitioner] presented the testimony of an investigator, photographs, and maps to demonstrate that Dansby and Irvin, who had claimed . . . that they had seen [Petitioner] get into a cab[] could not have made that observation [from where they were allegedly located. However, Petitioner himself] admitted running with Shawny and Marv away from the scene. [Moreover, t]here was evidence that Dansby was out in the parking lot with the other members of the Hit Squad. . . . As to Irvin, she never gave a written statement about her observations of [Petitioner running away or getting into a cab], although she claims to have given many [statements], including, as incredibly as it sounds, to a pair of identical twin detectives. This led to a stipulation at trial read by the Court:

> Counsel agree after reviewing all investigative files regarding the homicide of [Powell/Quill] that the only statement, either sworn or unsworn, from Tracie Irvin is the sworn statement [as to the threats made to her by Petitioner]. . . . [C]ounsel have agreed and stipulated that there does not exist any memorandum by any police officer indicating that [Irvin] saw [Petitioner] leaving the scene of a homicide shortly after the homicide.

Thus, DeBlis did not know prior to Irvin's testimony at trial that she had claimed to have seen [Petitioner] at the scene [or leaving in a cab. Correspondingly,] DeBlis could not know the specific location that Irvin claimed to be when she made her observations. . . .

. . .

    [In addition, Petitioner asserts that DeBlis] was ineffective for failing to file a timely notice of alibi and for failing to elicit a complete alibi, and appellate counsel was ineffective for failing to argue that the trial court erred in not charging the jury regarding an alibi defense [produced, arguably, by] Rashine Smallwood . . . . The Court concludes that in reality Smallwood was not an alibi witness . . . . But even if Smallwood were so characterized, the errors by the court and counsel did not prejudice the defense because Smallwood was still permitted to testify and the jury was . . . properly charged as to identification, reasonable doubt, burden of proof, and the like. . . . [Petitioner now relies on the Ninth

Circuit law to assert that failure to give alibi charge warrants PCR relief]. It is true that the Ninth Circuit, alone among the circuits, says that the failure to give a requested alibi instruction is reversible error on direct appeal in the federal system. [However,] the requirement for an alibi charge in the Ninth Circuit derives from the Ninth Circuit's supervisory role over its district courts, not from any constitutional requirement. In fact, the requirement is not applicable to Habeas Corpus proceedings.

> The fact that a jury instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who relies on such an inadequacy will be entitled to habeas relief from a state court conviction.

Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). . . . [Here, a]n alibi charge was simply not appropriate . . . but even if it were, the error was harmless and appellate counsel certainly was not ineffective for failing to raise it.

. . .

In [addition, Petitioner] claims [that the t]rial counsel was ineffective for failing to inform the jury in cross-examination and summation about [what Petitioner qualifies as] critical inconsistencies in the stories of the State's key witnesses [i.e.,] Dansby, Irvin, Jones and Thomason . . . regarding whether and when [Petitioner] entered a cab [or] the timing and manner in which [Petitioner] entered Powell's apartment. Failing to address these two issues was not ineffective assistance because DeBlis . . . cross-examined these witnesses vigorously and argued forcefully during summation [addressing other aspects and weaknesses of these witnesses' testimonies. Thus, even if] DeBlis' performance was not perfect, . . . it was at least as effective as required.

. . .

[Petitioner also asserts that the] prosecutor committed misconduct in the opening . . . when he [made statements which could have been construed as suggesting that Petitioner] posed a danger to . . . the jury. [Petitioner also asserts that a]ppellate counsel was ineffective in not raising this issue. [However,] this was a case in which witnesses were terrorized by an alleged Hit Squad gang member and, in the face of that gang terror, recanted their prior statements. [In such] context, the prosecutor's comments were not inappropriate and appellate counsel was not ineffective for failing to raise [such] a meritless [basis]. . . .

Docket Entry No. 19 (footnotes omitted).


### 2.   *Appellate Division's Findings*

The Appellate Division reversed the denial of PCR relief and concluded as follows:

33

[Petitioner] argued in his direct appeal that he was entitled to reversal because . . . he was prejudiced by the admission of . . . Dansby's testimony that someone pointed a gun at her face the morning she testified[,] . . . he was prejudiced by the admission of . . . Dansby's testimony that "everyone is scared of [Petitioner,]" . . . [Petitioner's] other crimes and bad acts were erroneously admitted into evidence . . . and . . . the accumulation of errors deprived him of a fair trial.  In 2000, we rejected these arguments and affirmed the judgment of conviction . . . by way of a 105-page unpublished opinion. [Petitioner] filed a PCR petition . . . . An evidentiary hearing was conducted [and] the trial judge denied the PCR petition . . . in a 50-page written opinion. [Petitioner is now asserting that his] trial counsel was ineffective in failing to file a timely notice of alibi . . . to elicit a complete alibi, and appellate counsel was ineffective in failing to argue [on the basis of denial of jury] charge . . . regarding an alibi defense[, and that the] trial counsel was ineffective in failing to investigate the crime scene [to determine that] two State's witnesses were lying when they claimed to observe [Petitioner] immediately after the shooting [and leaving in a cab, and that trial c]ounsel was also ineffective in failing to inform the jurors . . . of critical inconsistencies in the stories of the state's four key witnesses[, and that the trial counsel was ineffective in failing to limit the jury's exposure to other-crimes evidence and in allowing the state to introduce [statement] that "everyone was afraid of [Petitioner, and that] trial or appellate counsel or both were ineffective in failing to raise the issue [or severing Petitioner's trial from Brown's, and that] the prosecutor committed misconduct when he . . . stated that [Petitioner] . . . posed a danger to the community and to the jurors [and a]ppellate counsel was ineffective in failing to raise this issue. . . . [W]e find insufficient merit in Points [dealing with all issues except for the following three:] . . . We hold that trial counsel was ineffective in failing to fully elicit testimony from [Petitioner's] alibi witness, and appellate counsel was ineffective in failing to raise on direct appeal the trial judge's failure to give an alibi [jury charge].  We are also satisfied that trial counsel was ineffective in failing to object when the prosecutor . . . suggested that the jurors would be in danger merely by sitting in the courtroom but for the presence of sheriff's officers, and appellate counsel was ineffective in failing to pursue that issue on appeal.  We [also] hold [cumulative error] militates in favor of post-conviction relief. . . . [W]e apply the two-part test formulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  . . . [DeBlis] indicated during the course of the trial a desire to call . . . Smallwood as an alibi witness despite [Petitioner's] failure to give notice of an alibi pursuant to [state rules].  . . .  We agree with [Petitioner's] contention that the substance of Smallwood's testimony should have been more clearly elicited [during Smallwood's testimony before the jurors].  . . . Smallwood testified out of the presence of the jury that he was in the parking lot outside Powell[/Quill]'s apartment, that [Petitioner] was also standing in the parking lot, and that he and [Petitioner], among others, ran from the parking lot when gunshots were heard; he further stated that he did not see a weapon in [Petitioner's] hand at that time.  When the jury was present, [DeBlis] established

34

through Smallwood's testimony that he and [Petitioner], among others, were in
the parking lot, that Smallwood heard gunshots, and that he and others, including
[Petitioner], ran from the scene. Defense counsel, however, never firmly
established from the witness, while the jury was present, that [Petitioner] was in
the parking lot – and therefore not in the victim's apartment – at the moment the
shots rang out. As a result, . . . the jury may have concluded that Smallwood
observed [Petitioner] before the shooting and they ran away together after the
shooting, yet [Petitioner] may have been inside Powell[/Quill]'s apartment when
the shots were fired. . . . [T]he alibi instruction should have been given if for no
other reason than [Petitioner] was entitled to an instruction that would guide the
jury in its consideration of his theory of the case. . . . [That] demonstrate[s] that
[Petitioner's] appellate counsel failed to conform to the standard constitutionally
imposed in the direct appeal. . . . [W]e are also satisfied that certain of the
prosecutor's comments, which were not objected to at trial and were not raised on
direct appeal, prejudiced [Petitioner] and generated a reasonable doubt about the
outcome of the trial. . . . . The prosecutor's comment during his opening
statement that the jury was safe in the courtroom from [Petitioner] and others only
because the sheriff's officers were present far exceeded [the boundaries of
constitutional] principles. . . . We are satisfied that the first prong of the <u>Strickland</u>
. . . test was met because trial counsel failed to object . . . and because appellate
counsel failed to raise this . . . issue on appeal. And we are convinced that the
second prong of the test of ineffectiveness is present as well. The jury heard about
the danger [which] undoubtedly impacted upon the fairness of the trial and the
reliability of its outcome. . . .

<u>Echols-NJAD</u>, 2005 WL 3078494 (footnotes, citations to state law and to <u>Berger v. United
States</u>, 295 U.S. 78, 88 (1935), omitted).

### 3.    *Decision Reached by the Supreme Court of New Jersey*

The determination entered by the Appellate Division was reversed by the New

Jersey Supreme Court, which reinstated the outcome reached by the Law Division. <u>See</u>

<u>Echols-NJSC</u>, 199 N.J. 344 (2009). In its unanimous decision, the Supreme Court of

New Jersey stated, in relevant parts, as follows:

Our post-conviction relief proceeding is the analogue to the federal writ of habeas
corpus. . . . We turn now to apply the <u>Strickland</u> test to [Petitioner's] various
claims . . . . We first address whether trial counsel's failure to object to a portion
of the prosecutor's opening statement constituted ineffective assistance of
counsel. The asserted offending comment occurred when the prosecutor was

35

attempting to explain to the jury why some of the witnesses . . . later changed their stories. After stating that the witnesses had been threatened and intimidated by the defendant and members of the "Hit Squad" gang, the prosecutor said that the witnesses "are not people who like you are able to sit in a fairly nice courtroom in Essex County. The sheriff officers are here, so that you can feel safe and comfortable. You know that nothing is going to happen to you. You are just hearing evidence." . . . Reversal is justified when . . . the conduct was so egregious as to deprive defendant of a fair trial. . . . In determining whether a prosecutor's comments meet the "so egregious" standard, a reviewing court must consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred. . . . Applying the above tenets to the facts here, we do not find that the prosecutor's comments were so egregious that [Petitioner] was deprived of a fair trial. The prosecutor intended to show that several witnesses were threatened and intimidated as part of the State's effort to explain the change in their anticipated testimony, and informed the jury of that. [While] the prosecutor's reference to the safety of the jurors in the courtroom was completely unrelated to the facts to be presented at trial[, and] the prosecutor should not have contrasted the threats and intimidation of the witnesses with the fact that the jurors would be hearing the case in a safe environment . . . , we are convinced that the comments by the prosecutor did not deprive [Petitioner] of a fair trial. [Moreover,] the trial court advised the jury in both the preliminary instructions and the final jury charge that the attorneys' comments were not evidence. In short, the prosecutor's brief reference to the safety of the jury in the beginning of the eighteen-day trial was not so egregious as to be reversible error. . . . [Granted that there was] no reversible error in the prosecutor's comments, the failure of trial counsel to object to the comments or the failure of appellate counsel to raise that issue on appeal could not lead to the conclusion that there is a reasonable probability that, but for the errors of trial and appellate counsel, the outcome would have been different. We [thus,] reject [Petitioner's] claim that his trial counsel and appellate counsel provided ineffective assistance of counsel in regard to this issue.

We turn now to the State's contention that trial and appellate counsel were not ineffective in their handling of the alibi issue. . . . [T]he Appellate Division [ruled] that trial counsel was ineffective for not fully eliciting Smallwood's alibi testimony. He argued that once counsel established during the [preliminary] hearing that [Petitioner] was in Smallwood's sight outside of the apartment when the shots rang out, counsel was ineffective for not eliciting that identical alibi testimony before the jury. Although counsel might have attempted to elicit the same testimony in front of the jury as he and the prosecutor elicited during the [preliminary] hearing, his failure to do so did not render his performance below an objective standard of reasonableness. Before the jury, . . . Smallwood responded that he ran after hearing the shots, [and] counsel asked if anyone else ran. Smallwood answered that he ran together with [Petitioner] and that he saw no gun in [Petitioner's] hand. . . . [T]hat testimony was sufficient, if believed, for the jury

36

to comprehend that Smallwood claimed that he, [Petitioner], and others were in the parking lot when the shots were fired inside the apartment. . . . [E]ven if we assume that trial counsel was ineffective for not eliciting before the jury more precise testimony that Smallwood saw [Petitioner] in the parking lot at the same time shots were fired inside the victim's home, [Petitioner] nevertheless failed to establish the second prong of the Strickland test, that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  Given the other evidence in the case, any minor deviation between Smallwood's testimony at the [preliminary] hearing and his testimony before the jury could not have affected the outcome of the trial.

    The State also challenges the Appellate Division's conclusion that the trial court erred in not providing an alibi charge, and that appellate counsel was ineffective for not raising that issue on direct appeal. . . . [Since t]he trial court . . . determined that [Petitioner] could present Smallwood's testimony . . . , we are not confronted with a situation where the asserted alibi evidence was withheld from the jury . . . .  Rather, . . . the trial court denied [Petitioner's] counsel's request to provide the jury with an alibi charge.  We agree . . . that that was error[, but t]he question remains whether the failure to give an alibi charge requires a reversal of [Petitioner's] conviction.  We conclude that it does not.  Th[e state law] has long held that the failure to provide a separate alibi charge does not constitute reversible error. . . . [We explained that, t]here is no need to speak of alibi in such separate terms . . . .  The important thing is to make it plain to jurors that to convict they must be satisfied . . . that guilt has been established beyond a reasonable doubt.  If a defendant's factual claim is laid beside the State's and the jury understands that a reasonable doubt may arise out of the defense testimony as well as the State's, the jury has the issue in plain, unconfusing terms.  If events at the trial should be thought to suggest to the jury that the defendant has the burden of proving he could not physically have committed the crime, then of course the trial court should dissipate that danger by telling the jury that the defendant does not have the burden of proving where he was at the critical time . . . .  In the present case the evidence was not unduly complicated.  The State presented evidence that [Petitioner] harbored ill-will against the victim, who was a competitor in the sale of drugs; that [Petitioner] and Brown entered the victim's home with their faces covered; that gun shots were fired inside the victim's home; that [Petitioner] departed from the victim's home; that [Petitioner] later threatened certain witnesses; and that the witnesses refuted their prior statements.  On the other side, [Petitioner] denied shooting the victim and said he was in the parking lot at the critical time.  He presented Smallwood as a witness who placed [Petitioner] in the parking lot when shots were fired from inside the victim's home.  In the charge to the jury, the trial court instructed that defendant is presumed innocent, has no burden to prove anything, and the State has the burden to prove beyond a reasonable doubt that [Petitioner] committed the offense.  Later, in the charge on identification, the court said,

> [Petitioner] and Brown, as part of their general denial of guilt, contend the
> State has not presented sufficient, reliable evidence beyond a reasonable
> doubt that they are the persons who committed the alleged offense. Where
> the identity of the person who committed the crime is in issue, the burden
> of proving that identity is upon the State. The State must prove beyond a
> reasonable doubt that [Petitioner] and Brown are the persons who
> committed the crime. [Petitioner and Brown] have neither the burden nor
> the duty to show that the crime, if committed, was committed by
> somebody else. It's not their burden or obligation to prove the identity of
> any other person. You must decide, therefore, not only whether the State
> has proven each and every element of the offense charged beyond a
> reasonable doubt, but also that [Petitioner] under consideration is the
> person who committed it.
>
> In light of this charge,] the failure to charge alibi was . . . utterly harmless. . . .
> The trial court's instruction to the jury on identification, reasonable doubt, and the
> burden of proof made it clear that the prosecution had to prove beyond a
> reasonable doubt that [Petitioner] was present at the scene and committed the
> offense charged. . . . In short, even if appellate counsel had raised on appeal the
> trial court's failure to give the jury an alibi charge, the result would not have been
> different. It was error for the Appellate Division to conclude otherwise.

Id. (original brackets and quotation marks removed, citations omitted).

## III.   EXHAUSTION REQUIREMENT

It is a requirement of every § 2254 petition that federal constitutional claims be addressed

on the merits in State court and fully exhausted prior to the filing of a habeas petition in federal

court. See, e.g., Granberry v. Greer, 481 U.S. 129 (1987); Rose v. Lundy, 455 U.S. 509, 516-18

(1982); Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993). This means that each of the claims

heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal

habeas petition; in other words, both the legal theory and factual predicate of each particular

claim presented for federal habeas review must be materially the same as those of the

corresponding claim presented to all levels of state court. See Picard v. Connor, 404 U.S. 270,

275-77 (1971). The rationale of the "substantial equivalent" requirement is self-evident in light

of the standard of review applicable to federal habeas actions: habeas relief focuses on whether

the state court's adjudication of the petitioner claim "resulted . . . or involved an unreasonable

application of . . . Supreme Court precedent." 28 U.S.C. § 2254(d). However, "[a]n application

for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the

applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2);

Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355,

357 (3d Cir. 2003).[10]


## IV.   DISCUSSION

### A.   Petitioner's Instant Challenges

Petitioner's § 2254 application is a 36-page document accompanied by a 49-page

memorandum of law. See Docket Entry No. 4. While a number of Petitioner's factual assertions

---

[10]   Generally, district courts should dismiss petitions containing unexhausted claims in the absence of a state court decision clearly precluding further relief, even if it is not likely that a state court will consider the claims on the merits. See Rose v. Lundy, 455 U.S. at 522; Banks v. Horn, 126 F.3d 206, 212-14 (3d Cir. 1997); see also Toulson v. Beyer, 987 F.2d 984, 989 (3d Cir. 1993) ("Because no [New Jersey] court has concluded that petitioner is procedurally barred from raising his unexhausted claims and state law does not clearly require a finding of default, we hold that the district court should have dismissed the petition without prejudice for failure to exhaust state remedies"). However, because of the one-year AEDPA statute of limitations, federal courts, under certain circumstances, may stay § 2254 habeas proceedings to permit prisoners to exhaust state claims. See Rhines v. Weber, 544 U.S. 269, 277-78 (2005). Here, Petitioner has presented a "mixed" petition, but has not requested a stay. Nor has he asserted any facts suggesting that there is good cause for his failure to exhaust. In light of the foregoing, and given the volume of Petitioner's submissions, as well as the fact that he is represented by counsel, the Court finds that there is no reason to stay this matter to permit exhaustion of unexhausted claims (or to allow Petitioner to withdraw his unexhausted claim). Thus, although the Petition is dismissible as a "mixed" petition, in the interest of judicial economy, and having found that all of Petitioner's claims (exhausted and unexhausted) are meritless, the Court will, instead, deny the instant Petition, in its entirety, pursuant to § 2254(b)(2).

are stated in his Petition, additional factual assertions are scattered throughout the accompanying memorandum and even inserted in Petitioner's traverse. The Court has made an effort to liberally construe all of Petitioner's factual and legal assertions. Thus, the Court construes Petitioner's submissions as raising the following categories of challenges:

GROUND I   There is a Reasonable Probability That, but for Trial Counsel's Deficient Performance in Three Critical Respects, the Outcome Would Have Been Different, as:

    1.   His Handling of the Alibi Defense Was Inept

    2.   His Failure to Investigate the Crime Scene and to Marshal the Evidence Prevented the Jurors From Knowing That Two State's Witnesses Lied When They Implicated [Petitioner]

    3.   His Failure to Utilize State Procedures Permitted the Trial to be Tainted by Other-Crimes Evidence [such as:]

        a.   The Kidnapping Episode

        b.   Dansby's Testimony

        c.   The Rape of a Little Girl

        d.   The Police Photograph

    4.   DeBlis'[] Deficient Performance Prejudiced [Petitioner] and State Courts Were Unreasonable in Denying Relief

GROUND II   Appellate Counsel Was Ineffective Because He Failed to Raise:

    1.   That the Prosecutor Committed Misconduct in His Opening Statement

    2.   That [Petitioner's] Trial Should Have Been Severed From That of Co-Defendant Brown Because [Petitioner's] Statement to the Police Could Not Be Effectively Redacted

    3.   Other Errors That Would Have Prevailed on Direct Appeal

GROUND III   Relief Should Be Granted on the Basis of Cumulative Error.

See Docket Entry No. 4-1, at 2.

**B.**    **Legal Principles**

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. See Strickland, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.[11] The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance. See id. To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Importantly, the court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

---

[11] See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

41

The <u>Strickland</u> test applies to the performances of both trial and appellate counsel. <u>See</u> <u>Lewis v. Johnson</u>, 359 F.3d 646, 656 (3d Cir. 2004). When the issue is appellate counsel's failure to raise specific issues, a petitioner satisfies the first <u>Strickland</u> prong by showing that appellate counsel was "objectively unreasonable [<u>i.e.</u>,] that counsel unreasonably failed to discover [arguably] nonfrivolous issues and to file a merits brief raising them." <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). An arguably nonfrivolous issue is "one that counsel can argue in good faith with some potential for prevailing." <u>Id.</u> Consequently, the general principle established by <u>Smith</u> is that appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to maximize the likelihood of success on appeal." <u>Id.</u> at 288; <u>see</u> <u>also</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 750 (1983) (rejecting "per se rule that appellate counsel must raise every nonfrivolous issue").

## C.   **Analysis**

### 1.   **Challenges Related to Smallwood's Testimony**

#### a.   *Articulated Claims*

Petitioner raises a variety of challenges based on Smallwood's testimony. The Court has carefully and liberally considered each of Petitioner's arguments regarding Smallwood's testimony and, in doing so, has construed the following categories of claims:

(a)   DeBlis violated Petitioner's Sixth Amendment rights because DeBlis was aware of Smallwood's existence since he placed Smallwood on the list of witnesses, but DeBlis actually located and interviewed Smallwood "too late," which prevented DeBlis from

learning the exact content of Smallwood's testimony in time to file alibi notice, which – in turn – could have, theoretically, contributed to the trial court's denial of alibi charge;[12]

(b)    DeBlis violated Petitioner's Sixth Amendment rights because, due to DeBlis' alleged failure to locate Smallwood in a "timely" fashion, DeBlis did not/could not compose a sufficiently "lucid" theory of the case;

(c)    DeBlis violated Petitioner's Sixth Amendment rights because DeBlis failed to elicit what Petitioner would qualify as "a proper" alibi during Smallwood's testimony before the jurors since DeBlis' questions posed to Petitioner during the preliminary hearing differed slightly from those DeBlis asked before the jurors and yielded a marginally different response from Smallwood; and

(d)    DeBlis violated Petitioner's Sixth Amendment rights because DeBlis elected not to argue the alibi theory – or to refer to Smallwood's testimony – during his summation.

See Docket Entry No. 4-1, at 11-15.

i.    THE "'PROPER' ALIBI EXAMINATION" SUB-CLAIM

At the heart of Petitioner's argument lies the presumption that, during his testimony in the presence of the jurors, DeBlis would have necessarily succeeded at convincingly establishing that Smallwood was actually seeing Petitioner outside Powell/Quill's house at the very moments when the gunshots rang out. See id. at 13. Petitioner makes this deduction from the statement

---

[12] The Appellate Division, reversing denial of PCR, assessed the trial judge's decision (to decline giving alibi charge) on the grounds of the trial judge's conclusion that Smallwood's testimony was "not exactly" an alibi; that finding was seemingly based on the Law Division's unambiguous statement of the same. Moreover, there is no dispute that DeBlis sought, albeit unsuccessfully, inclusion of the exact alibi language in the jury instructions.

elicited by DeBlis during the preliminary hearing, when, in response to DeBlis' question, "When you heard the gunshots, did you see anybody else around?," Smallwood answered: "Oh yes when I ran we got down the end of Broad Street it was me Jamine[,] Raymond[,] and [Petitioner]." See supra II(A)(2)(c)(i), this Opinion (replicating the testimony).

Since the court reporter put a period after "yes" in this response, that court reporter's transcription transformed Smallwood's utterance into a compound answer, where the first two words, "oh yes," could be interpreted as the "proper" alibi Petitioner is now arguing for. Petitioner presumes that these two words were, in fact, meant by Smallwood to operate as a complete sentence and be separated by a period from the remainder of his utterance.[13] As a preliminary matter, Petitioner's argument based on deducements he makes from DeBlis' examinations of Smallwood is excessively tenuous. Cf. Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 731 (1973) (legal "adjudication cannot rest on any such 'house that Jack built' foundation"). In any event, it appears that Petitioner's alibi statement was elicited not by DeBlis, but at the preliminary cross-examination by the prosecutor, who asked Smallwood, "[Petitioner] was within your sight the whole time [i.e., during the entire period of two hours since you arrived to the parking lot and until, and throughout, your run after hearing

---

[13] The reliability of finer aspects of court reporting during Petitioner's trial, despite the poor quality of the transcript, is highly doubtful, especially as to such subtle aspects as the reporter's guesswork at to which exact punctuation witnesses intended to employ. See supra, note 10, this Opinion. Indeed, if Smallwood made merely a pause after "yes," intending to correspond to a comma, then his entire answer was a response to the not-asked question regarding the events after the gunshots, rather than the events which occurred during the gunshots. Although most of Petitioner's argument is based on DeBlis' preliminary and before-jurors direct examinations of Smallwood, Petitioner did not provide either the state courts or this Court with Smallwood's affidavit clarifying what exactly Smallwood meant to say when he was examined by DeBlis.

44

the shots]?," and obtained Smallwood's unambiguous "Yes" in response. See supra II(A)(2)(c)(i), this Opinion (replicating preliminary cross-examination).

During Smallwood's testimony before the jurors, DeBlis asked a set of questions virtually identical to that DeBlis asked during the preliminary hearing, thus allowing Smallwood to give testimony virtually identical to that rendered by Smallwood outside the presence of the jury, i.e., to state to the jurors that Smallwood was in the parking lot "near" Petitioner from 10:00 to 10:30 p.m., ran away with Petitioner when he heard the shots, and did not see a gun in Petitioner's hands. See See supra II(A)(2)(c)(i) and (ii), this Opinion (replicating both testimonies).

While Smallwood's testimony in response to DeBlis' questions before the jurors was nearly identical to that given during the preliminary hearing, the prosecutor's cross-examination before the jurors was far more extensive and challeged the credibility of Smallwood's story. See id. Smallwood's cross-examination testimony indicated that, during the two hours in question, Smallwood's attention was focused on a "young lady," Shante, and Smallwood's attention to her was so extensive and consuming that it prevented him from remembering the name of Shante's female companion, obstructed him from even processing whether "Marv" (whom Smallwood knew) was altogether present or absent at the parking lot and, moreover, even prevented him from noticing whether Jones a/k/a Dino, Donaldson a/k/a Boo-Boo and Eutsey a/k/a Shawny were there, even though Petitioner himself and other witnesses indeed placed these persons at the parking lot, right with Petitioner, during these very same hours. Consequently, Smallwood's cross-examination testimony yielded, effectively, an odd statement alleging that, for the entirety of the two hours he spent in the parking lot, while focusing on Shante and not noticing anyone

45

else until he began running away from the gunshots, Smallwood, without any stimulus or need, had nonetheless been keeping Petitioner in his eyesight at every moment.

So framed, Smallwood's testimony indeed provided Petitioner with an alibi but given the inconsistencies of his statements as an eyewitness, it is unclear why the prosecutor did not press Smallwood into an outright admission that Smallwood could not have seen Petitioner's whereabouts during the entirety of the two hours (which admission, if obtained, would have suggested to the jurors the very scenario which Petitioner is now concerned was adopted by the jury, i.e., that Petitioner escaped Smallwood's sight just for the few minutes needed to partake in Powell/Quill's murder). However, there is no dispute that the prosecutor did not attempt to press Smallwood for such admission and, as Respondents duly point out, the prosecutor – even when he was reflecting, in retrospect, on the entirety of his case – still did not try to foster such an argument during his summation. These facts, coupled with the course of DeBlis' direct examination of Smallwood, indicate that the mental impressions in the courtroom, and of both DeBlis and the prosecutor, were such that that Smallwood's testimony – no matter how odd or potentially lacking in credibility – did provide Petitioner with an alibi by placing Petitioner outside Powell/Quill's house at the very moments when the gunshots were fired. In other words, this Court has no reason to presume that the jury were so lacking in common sense to have developed an impression qualitatively different from those developed by the prosecutor, DeBlis and everyone in the courtroom.

In light of the foregoing, the Court finds: (a) the mental leap which DeBlis' direct examination of Smallwood invited the jurors to take (i.e., connecting Smallwood's statement that, from 10:00 to 10:30 p.m. he was in the parking lot "around Jamine Nelson, Raymond

46

George and [Petitioner]" to the statement that Smallwood began running together with Nelson, George and Petitioner as soon as the gunshots were fired, with the conclusion that Smallwood testified to seeing Petitioner outside Powell/Quill's house when the shots rang) could not re-qualify DeBlis' direct examination into an objectively unreasonable performance; and, in any event, (b) Petitioner failed to show a reasonable probability that, had the jurors been exposed to the same line of questioning that took place during the preliminary hearing, the jurors would have been left with the impression that, based on Smallwood's testimony, the State failed to establish Petitioner's guilt beyond a reasonable doubt. Therefore, the New Jersey Supreme Court's conclusion that:

> [Smallwood's] testimony was sufficient, if believed, for the jury to comprehend that Smallwood claimed that he, [Petitioner], and others were in the parking lot when the shots were fired inside the apartment [and, in any event, Petitioner] failed to establish the second prong of the Strickland test, that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Given the other evidence in the case, any minor deviation between Smallwood's testimony at the [preliminary] hearing and his testimony before the jury could not have affected the outcome[,]

Echols-NJSC, 199 N.J. 344, was not an unreasonable application of the Strickland test. Consequently, Petitioner's challenges asserting such unreasonableness will be dismissed.

### ii.   THE "NOTICE OF ALIBI AND JURY INSTRUCTIONS" SUB-CLAIMS

The set of two other, interrelated, challenges that Petitioner mounts on the basis of Smallwood's testimony equally fail to show that the state courts' determination was an unreasonable application of Supreme Court precedent. The first are Petitioner's assertions based on DeBlis' failure to give alibi notice. These assertions are facially deficient since: (a) they

47

allege merely a possibility of noncompliance with the niceties of state procedural rules, but "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause," Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997); and, in any event, (b) the fact that Petitioner's trial court exercised its discretion and allowed Smallwood to testify eliminated any federal due process aspects, since – for the purposes of the jurors' receipt of Smallwood's testimony – the outcome that actually took place was identical regardless of whether or not DeBlis filed a notice of alibi. Therefore, the state court's determination (to the effect that DeBlis' non-filing of alibi notice was harmless within the meaning of the second prong of Strickland) cannot qualify as an unreasonable application of this Supreme Court precedent.

Second, Petitioner's argument aiming to fault DeBlis for the trial court's decision not to incorporate in the jury instructions the exact language of alibi charge (which inclusion DeBlis sought) is loosely stitched to the underlying state courts' determinations, which differed since: (a) the Appellate Divisions found that the trial court's decision was driven by the trial court's own conclusion that Smallwood's testimony was "not exactly" an alibi rather than by DeBlis' failure to file a notice of alibi; and (b) the Supreme Court of New Jersey's decision found Smallwood's testimony an alibi but concluded that the trial judge provided the jurors with adequate jury instructions allowing the jurors full and proper consideration of Smallwood's statements and that, in turn, justified Petitioner's appellate counsel's election not to challenge the jury instructions.[14]

---

[14] Here, Petitioner's brief indicates that Petitioner does not wish to assert that his appellate counsel's decision to omit the challenge to jury instructions violated Petitioner's Sixth Amendment guarantees. See Docket Entry No. 4-1, at 40-48. Still, Petitioner's actual Petition suggests that Petitioner might be seeking to assert this particular "sub-ground." See Docket
(continued...)

Hence, it appears that, using the factual predicate connecting DeBlis' omission to file notice of alibi to the language of the jury instructions, Petitioner now seeks to challenge an earlier issue briefly addressed and dismissed in dicta by the Law Division.  However, no matter how the predicate of Petitioner's series of legal challenges is construed, none of these challenges establish that the state courts' determinations resulted in an unreasonable application of Supreme Court precedent.

A jury instruction, even if inconsistent with state law, does not necessarily merit federal habeas relief.  In particular, where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> the only question for [federal courts sitting in habeas review] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction . . . , [federal courts] inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that [federal courts] "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).[15]

---

[14](...continued)
Entry No. 4-1, at 29.  Erring on the side of safety, the Court presumes that Petitioner wished to make such challenge and merely omitted including it in his list of points repeated in his brief.

[15] Notably, the Law Division correctly guided Petitioner as to the applicable precedent.  In response to Petitioner's use of the Ninth Circuit internal appellate standard, the Law Division, relying on Estelle v. McGuire, 502 U.S. at 71-72, observed that "[t]he fact that a jury instruction is inadequate by Ninth Circuit direct appeal standards does not mean a petitioner who relies on such an inadequacy will be entitled to habeas relief from a state court conviction."  Echols, 2005
(continued...)

The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Here, Petitioner speculates that, "[t]he absence of an alibi charge might [have] permit[ted the] jurors to assume it was [Petitioner's] burden to prove the alibi." Docket Entry No. 4-1, at 32. However, the jury instructions given to Petitioner's jurors were crystal clear, stating, "[Petitioner] contend[s] the State has not presented sufficient, reliable evidence beyond a reasonable doubt that [he is] the person[] who committed the alleged offense. Where the [question of] who committed the crime is in issue, the burden of proving that identity is upon the State. The State must prove beyond a reasonable doubt that [Petitioner is] the person[] who

---

[15](...continued)
WL 3078494, at *20. Unsatisfied with both the Supreme Court holding in Estelle and the Law Division's reliance on this governing precedent, Petitioner now rearticulates the same argument before this Court. See Docket Entry No. 4-1, at 33. His point is facially without merit; the Ninth Circuit itself expressly denied habeas relief to litigants asserting failure to give an alibi charge. See, e.g., Thames v. White, 1999 U.S. App. LEXIS 23304 (9th Cir. Sept. 22, 1999) (relying for this finding on Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir. 1995), which, in turn, stated that the Ninth Circuit has "never held . . . that failure to give a specific alibi instruction is necessarily a constitutional violation. Nor has any other circuit"); see also Nolen v. Meyers, 98 Fed. App'x 97 (3d Cir. 2004).

50

committed the crime. [Petitioner has] neither the burden nor the duty to show that the crime, if committed, was committed by somebody else. It's not [his] burden or obligation to prove the identity of any other person. You must decide, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also that [Petitioner] under consideration is the person who committed it." Echols-NJSC, 199 N.J. at 364-65 (quoting the instructions actually given and applying the state law standard substantively indistinguishable from the governing habeas regime). In light of the charge language actually given, Petitioner's argument has no merit: the totality of the jury instructions received by Petitioner's jurors unambiguously establishes that the charge given did not so infect the entire trial to result in a conviction violating due process, since they did not lift the State's burden of proof and did not suggest that the jurors could convict Petitioner without determining that the State had proven each element of each crime beyond a reasonable doubt. Consequently, the Supreme Court of New Jersey's determination that the instructions, as given, did not violate Petitioner's rights was not an unreasonable application of the holdings reached by the Supreme Court in Estelle, Smith v. Horn and Sandstrom.

In light of the foregoing, Petitioner's argument (to the effect that the state courts unreasonably applied Supreme Court precedent to Petitioner's claim that his appellate counsel was ineffective in not raising the issue of the trial court's failure to include alibi charge in the jury instructions) is, too, without merit. As explained supra, appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. at 288; see also Jones v. Barnes, 463 U.S. at 750. Here, this Court need not engage in the guesswork as to whether Petitioner's

51

appellate counsel would have succeeded at raising state-law challenges to the language of jury instructions: the answer to that inquiry was conclusively provided, in a negative, by the Supreme Court of New Jersey, which dismissed that challenge on the basis of established state law, as it applied to the particular facts of Petitioner's claim.[16]  Since Petitioner's appellate counsel did not fail to raise an arguably meritorious issue on appeal, see Docket Entry No. 4, at 3-4 (reciting eight non-frivolous grounds raised by Petitioner's appellate counsel), the election made by Petitioner's appellate counsel to omit a particular challenge from Petitioner's appellate submissions was a permissible exercise of his strategic discretion.  See Smith v. Robbins, 528 U.S. at 288; Jones v. Barnes, 463 U.S. at 750.  In light of the foregoing, the Supreme Court of New Jersey's determination as to the sufficiency of Petitioner's appellate counsel's performance was not an unreasonable application of the governing Supreme Court precedent, and Petitioner's assertion to the contrary will be dismissed.

Next, regarding the unexhausted challenge that DeBlis' failure to give alibi notice contributed to the trial judge's exclusion of the alibi charge from the jury instructions, the Court finds Petitioner's position without merit.  As the above discussion demonstrates, the charge received by the jurors was clear: it was the State's burden to establish Petitioner's guilt, beyond a reasonable doubt, as to each element of each offense.  Consequently, Petitioner's allegations fail to satisfy the prejudice prong of the Strickland test because he does not establish that the jury

---

[16] While a litigant's direct appeal challenges could be governed by "a" state law which, theoretically, might be more favorable to a litigant than federal habeas standards, the Supreme Court of New Jersey's decision depicted the state standard as to alibi charge that is virtually identical to the federal habeas regimes, as defined in this Opinion.  See State v. Echols, 199 N.J. at 363 ("[State law] has long held that the failure to provide a separate alibi charge does not constitute reversible error") (citing State v. Edge, 57 N.J. 580, 590-91 (1971); State v. Peetros, 45 N.J. 540, 544-45 (1965).

could develop "a reasonable doubt respecting [Petitioner's] guilt" simply as a result of the jurors

hearing the exact words of alibi charge instead of the given charge language, which was

indistinguishable from the alibi charge in all substantive respects. See Strickland, 466 U.S. at

695. Therefore, Petitioner's argument seeking to tie DeBlis' failure to file notice of alibi to the

trial court's decision declining inclusion of the alibi charge in the language of jury instructions

fails to establish that the Law Division's brief observation of the invalidity of Petitioner's

position was an unreasonable application of Supreme Court precedent. Hence, this claim will,

too, be dismissed, pursuant to the Court's powers under the mandate of 28 U.S.C. § 2254(b)(2).

> iii.    THE "THEORY OF THE CASE AND SUMMATION"
>         SUB-CLAIMS

Finally, the Court turns to the cluster of challenges aiming to tie Smallwood's testimony

to: (a) DeBlis' alleged inability to coin a "lucid enough" theory of the case; and (b) the alleged

insufficiency of DeBlis' summation. Petitioner raises these challenges for the first time in the

instant matter, since Petitioner's PCR briefs (which introduced the alibi-related issues in the pool

of Petitioner's challenges) are silent as to these issues. See Docket Entry No. 4-14. Based on

the reasons that follow, these challenges are subject to dismissal pursuant to § 2254(b)(2).

Petitioner's allegations aimed at DeBlis' theory of the case are two-fold. See Docket

Entry No. 4-1, at 2 and 4. First, Petitioner maintains that DeBlis' theory of the case was not

"lucid" enough because: (a) DeBlis argued that Eutsey was one of the two assailants who

committed Powell/Quill's murder; but (b) DeBlis did not fully succeed at his attempt to show

that Eutsey escaped homicide charges (and Petitioner returned to being the subject of police

investigation) as a result of Eutsey's distant blood-relation to Jack Eutsey (who was the detective

performing Eutsey's arrest and also taking Thomason's statement).  See id.  Petitioner

misunderstands DeBlis' theory of the case as evinced by the record.  DeBlis argued that two

members of the Hit Squad murdered Powell/Quill,  that one of them was probably Eutsey, and

the other might have been Brown a/k/a "Crazy Joe," "Marv," Jones a/k/a "Boo-Boo," or someone

other than  Petitioner.  See generally, Docket Entries Nos. 15 and 16. That theory was not only

lucid, it was also consistently articulated during DeBlis' opening and summation, clearly traced

throughout all his lines of questioning and, moreover, was entirely reasonable in light of DeBlis'

need to take into account the fact that Petitioner was charged not only with murder but also with

giving false accusations against Eutsey.  Indeed, without focusing on Eutsey and suggesting that

Petitioner did not really falsely accuse Eutsey (i.e., that Petitioner's admission that he falsely

framed Eutsey was merely a result of undue external forces), DeBlis would have been unable to

provide a coherent defense against the totality of charges Petitioner was facing.

Nevertheless, Petitioner maintains that: (a) DeBlis erred by focusing on Eutsey and

should have abandoned the entire theory of Eutsey's relation to Detective Jack Eutsey simply

because DeBlis only partially succeeded at showing the relationship.  Further, Petitioner

maintains that (b) DeBlis erred by electing not to put the main emphasis on the alibi provided to

Petitioner by Smallwood.  These arguments, however, are also without merit.  While Detective

Eutsey denied his relationship with Eutsey (and denied any undue involvement in the

investigation of Powell/Quill's murder), it is undisputed that Eutsey did testify under oath that

Detective Jack Eutsey was his grand-uncle.  Consequently, there is no basis for this Court to

conclude that DeBlis' theory of Eutsey's relation to Detective Jack Eutsey was facially

unreasonable or had to be abandoned out of concern that Detective Eutsey might decline to

54

confirm it: finding otherwise would yield an anomalous result where any defense theory based on police conspiracy or police cover-up would necessarily amount to a violation of the Strickland test unless defense counsel actually succeeds at getting the police to admit the very same facts which were testified-to by non-police witnesses.

The same applies, a fortiori, to DeBlis' strategic election to adopt a broad "whoever-the-assailant-was-it-was-not-Petitioner-who-was-the-assailant" theory, putting his main emphasis on Eutsey and including Smallwood's testimony as just a small piece of the puzzle. While Petitioner now argues that DeBlis should have put the main emphasis on a narrower "Petitioner-had-Smallwood's-alibi" theory, DeBlis' strategic choice in favor of the broader theory of the case falls expressly within the presumptive protections of Strickland. See Strickland, 466 U.S. at 689; Thomas, 428 F. 3d at 499 ("To overcome the Strickland presumption that . . . a challenged action [was] sound trial strategy, a habeas petitioner must show . . . that the actions could never be considered part of a sound strategy"), as does DeBlis' election not to centerpiece the alibi provided by Smallwood. See id. The same conclusion applies with equal force to DeBlis' choice of summation argument. Given that Smallwood's alibi was so inconsistent, this Court cannot find that DeBlis' choice (to highlight other aspects of the defense's case and omit mentioning Smallwood's testimony) was an unreasonable summation strategy.

### b.  *Remaining Claims*

Petitioner also included three sub-claims in the body of his Petition and brief. Specifically, Petitioner suggested that DeBlis' performance failed to meet the Strickland test because: (a) DeBlis located and interviewed Smallwood when the trial was already underway,

55

which was automatically "too late" for any purpose; (b) DeBlis failed to locate other witnesses

had he traced Smallwood sooner, and these witnesses may have supported Smallwood's alibi;

and (c) DeBlis allowed Smallwood to testify in prison garb, which, Petitioner believes,

diminished the credibility of the alibi provided by Smallwood.  See, generally, Docket Entries

Nos. 4 and 4-1.

### i.    THE "SPECULATIVE TIMETABLE" SUB-CLAIM

Petitioner argues that DeBlis' performance was automatically deficient within the

meaning of the Sixth Amendment because DeBlis succeeded at locating and interviewing

"Rasheed/Rashine" Smallwood only when the trial was already underway and the State was

resting its case.[17]  This claim is without merit.  There is no constitutional requirement which sets

---

[17] In support of this proposition, Petitioner relies on Williams v. Taylor, 529 U.S. 362,
395 (2005).  However, the Supreme Court in Williams observed as follows:

> We are . . . persuaded that the Virginia trial judge correctly applied both components of
> [the Strickland] standard to Williams' ineffectiveness claim.  Although he concluded that
> counsel competently handled the guilt phase of the trial, he found that their representation
> during the sentencing phase fell short of professional standards . . . .  The record
> establishes that counsel did not begin to prepare for that phase of the proceeding until a
> week before the trial.  Id. at 207, 227.  They failed to conduct an investigation that would
> have uncovered extensive records graphically describing Williams' nightmarish
> childhood, not because of any strategic calculation but because they incorrectly thought
> that state law barred access to such records.  Had they done so, the jury would have
> learned that Williams' parents had been imprisoned for the criminal neglect of Williams
> and his siblings, that Williams had been severely and repeatedly beaten by his father, that
> he had been committed to the custody of the social services bureau for two years during
> his parents' incarceration (including one stint in an abusive foster home), and then, after
> his parents were released from prison, had been returned to his parents' custody.

Williams, 529 U.S. at 395.  The record in this case depicts a scenario diametrically opposed to
that in Williams since here: (a) defense counsel DeBlis strived to determine the identity and
usefulness of "Rasheed/Rashine" as soon as he got the information; (b) DeBlis began his search
(continued...)

a time limit within which counsel's investigatory efforts must yield success. Under the Strickland standard, DeBlis was merely expected to investigate the lead he had with a reasonable degree of ardor and diligence, and the record clearly establishes that he did so. See Docket Entry No. 15-20, at 10-11 (detailing the obstacles DeBlis faced, the efforts DeBlis undertook and Brown's counsel's elaborations on the hardships DeBlis encountered). Moreover, there is no dispute that the end result of DeBlis' efforts was both timely and successful, since Smallwood did indeed testify. Consequently, Petitioner's position that Smallwood was located and interviewed "too late" is without merit and is hereby dismissed pursuant to § 2254(b)(2).

ii.      THE "SPECULATIVE WITNESSES" SUB-CLAIM

Petitioner's next argument is that DeBlis' performance was deficient because DeBlis failed to locate and present testimonies of Jermaine Nelson, Marvin Anthony and Raymond George. Petitioner speculates that these persons might have been his "alibi" witnesses,[18] and he deduces from that speculation that DeBlis' failure to locate these witnesses and investigate their

---

[17](...continued)
for Smallwood once he got word that "Rasheed/Rashine" was a "Smallwood"; (c) DeBlis at no point relented in his search for Smallwood on the grounds of a wrongful impression that Smallwood's testimony would be barred by state law; and (d) Petitioner's jurors actually got to learn all that Smallwood could offer them. Since the entirety of the circumstances addressed in Williams is a clear antithesis to the circumstances in the case at bar, Petitioner's reliance on Williams is unavailing.

[18] While it appears that Petitioner ties Smallwood to Nelson and George because Smallwood testified that he ran together with Nelson, George and Petitioner after he heard the gunshots, Petitioner's rationale for tying Smallwood's testimony to Anthony is not entirely clear to the Court since Smallwood expressly testified that he could not process whether Anthony was present or absent at the parking lot during the evening of Powell/Quill's murder. In addition, it is unclear what other reasons, if any, DeBlis might have had for seeking Anthony as a witness or an "alibi" witness, or for thinking that Anthony wished to be "found" and/or would be interested in testifying in Petitioner's defense (since Anthony a/k/a "Marv" was mentioned as one of potential Powell/Quill's assailants).

57

stories was an act of ineffective assistance within the meaning of the <u>Strickland</u> standard. In support of his conclusion, Petitioner relies on <u>Rolan v. Vaughn</u>, 445 F.3d 671 (3d Cir. 2006). Based on the reasons that follow, Petitioner's reliance on <u>Rolan</u> is misplaced.

In <u>Rolan</u>, the petitioner presented a self-defense theory at his trial for murder. Petitioner in that case claimed that he and his cousin were involved in a dispute with a certain Paulino Santiago and Francisco Santiago over the proceeds of a drug sale. <u>See id.</u> at 674. According to Rolan, during the argument, Francisco went into an abandoned building where guns and ammunition were stored and Rolan followed him to continue the argument. <u>See id.</u> Rolan also maintained that Paulino followed them into the building with what Rolan believed to be a knife, and that Paulino shouted a threat at Rolan before charging at him. <u>See id.</u> Rolan also claimed he noticed a loaded rifle, picked it up, and killed Paulino with a single shot. <u>See id.</u> Prior to trial, Rolan provided his defense counsel with the actual names of persons, expressly defining them as Rolan's self-defense witnesses: Robert Aponte and Daniel Vargas. <u>See id.</u> at 675. However, Rolan's counsel, despite being given these clear leads, never attempted to contact Aponte or Vargas. <u>See id.</u> After Rolan was convicted of first-degree murder and possession of an instrument of crime, <u>see id.</u> at 674, he had his PCR hearing. During that hearing, Vargas stated that he would have testified on Rolan's behalf and would have averred: 1) when Rolan went into the abandoned house, he was carrying only a quart of beer but no rifle; 2) that Paulino came from around the corner with a kitchen knife and entered the building behind Rolan; and 3) Paulino screamed upon going into the house, "I'll kill you, motherf-cker!" <u>Id.</u> Vargas also testified that he then heard a shot, went into the house together with Aponte, and he and Aponte found Paulino lying on the ground with a knife at his feet. <u>See id.</u> In light of the testimony provided by Vargas,

58

and taking notice of the fact that Rolan gave his counsel actual names of both Vargas and Aponte, the Court of Appeals affirmed the district court's grant of habeas relief finding that defense counsel's failure to investigate Aponte and Vargas not only fell below an objective standard of reasonableness, but was also prejudicial to the Rolan's defense. See id. at 682, 683.

The holding of Rolan underscores two key principles governing this type of inquiry: (a) counsel is not obligated to chase after the wind (e.g., by striving to locate and interview anyone who might have been in the neighborhood) in hopes of stumbling upon a witness whose testimony might turn out favorable; and (b) habeas relief may be warranted upon the petitioner's showing that the not-called witness was both willing/able to testify and actually offered testimony/affidavit/statement so favorable to the petitioner that lack thereof resulted in prejudice to the petitioner's case within the meaning of the second prong of Strickland. See Strickland, 466 U.S. at 690-91; see also Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); accord Lewis v. Mazurkiewcz, 915 F.2d 106 (3d Cir. 1990) (expressly adopting Strickland and Kimmelman rationale for the purposes of failure-to-investigate analysis).

Here, Petitioner invites the Court to find that DeBlis provided him with ineffective assistance based on the speculation that: (a) Nelson or Anthony or George could have been both willing/able to testify; and (b) could have provided him with "alibi" testimonies. However, the law of Sixth Amendment adjudication does not turn on the litigants' speculations. See Rolan, 445 F.3d at 674-82. Because Petitioner has failed to substantiate this line of challenges with anything more than pure speculation, such challenges are hereby dismissed as facially meritless pursuant to Section 2254(b)(2).

      **iii.**     THE "WITNESSES-IN-PRISON-GARB" SUB-CLAIMS

Petitioner also asserts that his constitutional rights were violated because Smallwood, testified while dressed in a prison garb. <u>See</u> Docket Entry No. 4, at 9; <u>see also</u> Docket Entry No. 4-1, at 12, 32-33 (asserting that Smallwood's wearing of prison garb diminished credibility of the alibi Smallwood provided to Petitioner). In support of that proposition, Petitioner relies on state case law only and, moreover, on the state law that came in existence long after Petitioner's trial and even his appeal were over. <u>See</u> Docket Entry No. 4, at 32; <u>see also</u> Docket Entry No. 4-1, at 48. Amplifying these shortcomings, Petitioner simultaneously asserts that, in addition to being disadvantaged challenges to Smallwood's credibility due to his prison attire, Petitioner was also disadvantaged by the fact that two State's witnesses, Donaldson a/k/a/ Dino and Jones a/k/a Boo-Boo, also testified in prison garb. <u>See</u> Docket Entry No. 4, at 25. Based on the reasons that follow, Petitioner's position is deficient on a many levels.

First, Petitioner's reliance on state case law that came to light *after* the alleged wrongful acts took place is, by definition, unavailing. Moreover, Petitioner's reliance on state law, then-existing or later-adopted, is misplaced. As previously stated, "errors of state law cannot be repackaged as federal errors," <u>Johnson</u>, 117 F.3d at 110, and there is no Supreme Court precedent on point. Lack of Supreme Court precedent automatically concludes this Court's review, since a state court's determination cannot be an unreasonable application of the Supreme Court precedent which does not exist. <u>See</u> <u>Smith v. Spisak</u>, 130 S. Ct. 676, 684 (2010) (no right to habeas relief if Supreme Court has not previously held that the act was unconstitutional for same reason); <u>accord</u> <u>Dansby v. Trombley</u>, 369 Fed. App'x 657, 659 (6th Cir. 2010) ("[petitioner's § 2254] claim fails because the Supreme Court has never held" what petitioner asserts). Petitioner's claims in this regard are therefore subject to dismissal because the state court's

60

determination that Petitioner was not entitled to relief on the grounds of witnesses' prison garb could not have been an unreasonable application of Supreme Court precedent.

Second, even if this Court were to give Petitioner the benefit of the doubt and presume that Petitioner did not seek to argue a non-existent Supreme Court precedent and, rather, raised this line of claims in the hope of drawing an analogy to the holding of Estelle v. Williams, 425 U.S. 501 (1976), Petitioner's claims fail.  In Estelle, the Supreme Court held that, when *defendants* are forced to wear prison garb to trial, the clothing may create a subtle prejudice undermining the presumption of innocence. See Washington, 462 F.3d at 1136 (citing Estelle, 425 U.S. at 504-05).  While a state "cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes," a defendant may waive any objection to being tried in prison garb by failing to object at trial, "the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." Id. at 512-13.  However, it is only a state's compulsion that is prohibited, and not the wearing of prison garb in general, because defendants sometimes use prison garb as a tactic to elicit sympathy from the jury. See id. at 508.  The Supreme Court has similarly recognized that due process precludes the use of visible physical restraints upon a *defendant* "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005) (citing Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986); Illinois v. Allen, 397 U.S. 337, 343-44 (1970)).

The Supreme Court, however, has never held that the prohibition on compelling a defendant to wear prison garb applies to witnesses.  Moreover, no extension of the prohibition to

61